847 P.2d 1093

**In the Matter of a Member of the State Bar of Arizona, Jack LEVINE, Respondent.**

**No. SB–91–0028–D.**

Supreme Court of Arizona, En Banc.

Feb. 18, 1993.

Meyer, Hendricks, Victor, Osborn & Maledon, P.A. by Bruce E. Meyerson and Mark Andrew Fuller, Phoenix, for respondent.

Peter M. Jarosz, Bar Counsel, Phoenix, for State Bar of Ariz.

## OPINION

EINO M. JACOBSON, Court of Appeals Judge.

The Disciplinary Commission of the Supreme Court has recommended that Jack Levine (respondent) be suspended from the practice of law for a period of three years. Respondent filed a timely appeal from the commission's recommendation. We have jurisdiction pursuant to Rule 53(e), Rules of the Arizona Supreme Court.

## PROCEDURAL BACKGROUND

On December 15, 1989, the state bar filed a formal complaint against respondent, charging him with violating the Rules of Professional Conduct, Rule 42, Rules of the Arizona Supreme Court (Rule 42), as well as the Code of Professional Responsibility, former Rule 29, Rules of the Arizona Supreme Court (former Rule 29).[1] The bar complaint alleged fourteen counts of unethical conduct arising from numerous lawsuits that respondent instituted and maintained, either personally or on behalf of a client, against his former law partner and others. The primary allegation of misconduct [2] in the bar complaint was that respondent's participation in such suits was frivolous, without a good faith basis to extend, modify, or reverse existing law, and was without substantial purpose other than to embarrass, delay, or burden third persons, in violation of Rule 42, E.R. 3.1 and 4.4. Respondent filed a timely answer.

Hearings in this matter commenced on April 30, 1990, before Hearing Committee 6H (committee). The evidentiary hearing continued for seven days, during which 158 exhibits were admitted, totaling over 6000 pages. The hearing transcripts consumed almost 2000 pages, with the appellate briefs in this court adding another 100 pages. The volume of this disciplinary record is unparalleled in the recent history of this court.

On September 19, 1990, the committee issued its report, finding that clear and convincing evidence supported the allegations in counts 1 through 10 and 14, and dismissing the remaining counts. Finding both mitigating and aggravating factors, the committee recommended that respondent be suspended from the practice of law for a period of three years, that he be ordered to make restitution by paying all awards of fees and sanctions assessed against him personally arising from the unethical conduct, and that he be assessed costs of the proceedings.

The commission heard the matter on February 9, 1991, and issued its report on March 29, 1991. The commission generally adopted the committee's findings of fact and conclusions of law, subject to several additions, deletions, and comments, and adopted the committee's recommendation that respondent be suspended for a period of three years. Two members of the commission, although agreeing with the committee findings, opposed the recommended sanction of a three year suspension as "too lengthy a term of suspension in light of the likelihood that Respondent will not re-engage in similar conduct." Respondent timely appealed.

## DISCUSSION

### I. *Standard of Review*

In reviewing disciplinary proceedings from the committee and the commission, this court is guided by several well-established principles: first, we are an independent trier of both fact and law; second, we give great deference to the reports

---

1. The conduct alleged in the bar complaint occurred both prior to and after February 1, 1985. The current Rules of Professional Conduct in Rule 42 replaced the Code of Professional Responsibility in former Rule 29(a) effective February 1, 1985. Thus, the former Disciplinary Rules apply to respondent's conduct before February 1, 1985, while the current Ethical Rules apply to his conduct after that date.

2. Respondent was also charged with a violation of DR 1–102(A)(4) in count 11 (attempting to settle case of persons not your clients); a violation of E.R. 4.2 in count 12 (communicating with another attorney's client without his consent); and a violation of DR 9–102 in count 13 (failing to preserve client funds). However, these counts were dismissed by the hearing committee and are not before us on appeal.

of the committee and commission, but before we impose discipline, we must be persuaded that the alleged ethical violations are supported by clear and convincing evidence; and third, we have the ultimate responsibility for imposing the appropriate sanctions. *In re Lincoln*, 165 Ariz. 233, 235–36, 798 P.2d 371, 373–74 (1990).

## II. *History of Litigations*

The testimony and evidence in this matter, in the words of the committee, "recounted a near decade long saga which arose from the breakup of the law firm of Levine & Harris [, P.C.]," and "[t]he fourteen-count Complaint relates to [that] one underlying fact situation and the Respondent's reaction to that situation." The commission noted the "unusual character" of the situation giving rise to the multiple counts of the bar complaint, and recognized that "cases like this one do not fit within 'cubby holes.'" We agree with these characterizations. Because of the complexity of the facts and evidence presented in regard to the individual counts, we first discuss respondent's conduct by recounting a history of the individual litigations in a chronological context, so far as possible.

### A. *The Levine and Harris Litigation: Count 10*

Respondent and John D. Harris practiced law together for about seventeen months, from April 1980 until August 1981. After they dissolved their practice, disputes arose between respondent and Harris regarding the division of the assets of the firm, including clients' contingency fees in pending cases. Those disputes were ultimately resolved in binding arbitration by an award issued on February 10, 1983. Respondent challenged the arbitration award in a series of legal actions. The arbitration award was ultimately confirmed in superior court and affirmed by the court of appeals. Respondent also filed a bar complaint against Harris and his new partner, Anthony Palumbo. After investigation, bar staff concluded that Harris and Palumbo had not violated any ethical rules, and respondent's complaint was dismissed on April 22, 1983.

Based on the same dispute that was a subject of the arbitration, respondent filed suit in superior court on April 25, 1983, on behalf of his corporate entity, Jack Levine, P.C., against Harris and Palumbo, individually and as a law firm. In addition, respondent named himself and his wife as defendants. Respondent alleged tortious interference with contractual relations, misappropriation of the professional corporation's monies, conversion, and breach of contract. In April 1984, respondent settled the suit against himself by agreeing to abide by the arbitration agreement. The remainder of the suit ultimately was resolved in favor of Harris and Palumbo, and the superior court awarded Harris attorney's fees of $150,000 under authority of A.R.S. § 12–341.01(C), A.R.S. § 12–349, and Rule 11, Arizona Rules of Civil Procedure, after finding the suits groundless, without substantial justification, and prosecuted in bad faith.

Levine's institution and maintenance of the 1983 consolidated suits against Harris and Palumbo, on behalf of Jack Levine, P.C.,[3] formed the basis of amended count 10 of the bar complaint. Levine's refiling of an action for declaratory judgment that Harris not receive any fees from another litigation involving Anthony Abril, discussed below, was also alleged in count 10.

### B. *Abril v. Harris Litigation: Counts 1–4*

On June 1, 1981, Anthony Abril, Jr., retained the firm of Levine & Harris, P.C., to represent him in a bad faith suit against Globe American Insurance Company (Globe). This suit was based on Globe's refusal to settle a personal injury action against Abril that had resulted in an excess judgment of $95,000 in favor of Gregory Johnson, a pedestrian who had been injured in a hit-and-run accident in which Abril was the driver.

---

**3.** The professional corporation was technically represented by attorneys Mitchel Cohen and R.Y. Thrasher.

In November 1981, after the firm of Levine & Harris dissolved, Abril chose Harris and his new firm, Harris & Palumbo, to continue the litigation. In 1984 Harris succeeded in obtaining a judgment of $1,300,-000 in Abril's favor against Globe. In January 1985, Globe appealed from that judgment.

On April 9, 1985, Abril fired Harris and his new firm and retained respondent to represent him. Respondent successfully moved to strike an appellate brief that Harris and his associates had filed in the court of appeals, and substituted his own brief on Abril's behalf. After oral argument in the court of appeals, in which respondent participated, the court of appeals reversed the punitive damages portion of Abril's judgment of $1,000,000, but affirmed the compensatory damages portion of $300,000. *Abril v. Globe American Cas. Co.*, 1 CA–CIV 8172, Ariz.App. mem. dec. filed Aug. 15, 1986. Respondent then filed a petition for review in this court, which was denied.

Before filing the bad faith suit, Harris had unsuccessfully attempted to assign Abril's bad faith claim to Johnson. After this failed, on July 6, 1981, Harris entered into an agreement, allegedly without Abril's knowledge, with William Piatt, Johnson's counsel in the personal injury case. Under this agreement, Piatt would attempt to increase his contingency fee from Johnson from 33% to 50%, and for any amount up to $95,000 that Abril recovered from Globe, Piatt would split his contingency fee with Harris. This agreement was made on behalf of Levine & Harris, P.C., before the dissolution, and later became one of the subjects of the arbitration award.

After Abril had discharged Harris, telephone discussions occurred between Harris and Piatt regarding renewal of the Johnson judgment against Abril. Harris also wrote to Piatt on June 3, 1985, noting the date that the judgment would expire and advising Piatt to renew it "immediately." Piatt subsequently renewed the Johnson judgment against Abril. After Abril's compensatory damages against Globe were affirmed on appeal, Piatt served a garnishment on Globe for the amount Abril still owed on the Johnson judgment. Harris eventually credited Abril with $25,482.15 towards Abril's attorney's fees from Piatt's payment to Harris under the fee agreement between Harris and Piatt.

When Abril learned of the fee agreement between Harris and Piatt and the renewal of the Johnson judgment against him, he asked respondent to file a suit against Harris, alleging a conflict of interest and breach of fiduciary relationship. Respondent persuaded Abril to file two bar complaints against Harris instead. When the bar complaints ultimately were dismissed, respondent then filed, on Abril's behalf, a suit against Harris & Palumbo, M. Byron Lewis, John R. Cunningham, and Harris & Palumbo, P.C., alleging five causes of action, seeking more than $41,000,000 in damages.

After the trial court granted summary judgment in favor of Harris and indicated its intent to award attorney's fees against respondent personally, respondent filed a special action in the court of appeals, which declined jurisdiction. The trial court ultimately assessed attorney's fees against respondent for $7,586.25. Respondent then appealed the granting of summary judgment; that judgment was affirmed, and the court of appeals awarded attorney's fees against respondent for $9,418.25. *Abril v. Harris*, 157 Ariz. 78, 754 P.2d 1353 (App. 1987). Respondent filed a petition for review in the Arizona Supreme Court, which was denied with a fee award against respondent for $1,950.

The Abril suit against Harris, the special action, appeal, and petition for review form the basis of counts 1 through 4 of the bar complaint, respectively.

### C. *Federal Court Litigation: Count 5*

After judgment was entered against respondent personally for attorney's fees in the Abril litigation, respondent, acting *pro se*, filed a complaint in federal district court seeking to enjoin execution of that judgment because he was unable to post a supersedeas bond in state court. He contended that the judgment against him was

entered without notice and a hearing and therefore violated constitutional due process. After that complaint was dismissed, the federal district court assessed attorney's fees against respondent in the amount of $500, finding that respondent's allegation of a "conspiracy" between the state court judge and the defendants in the Abril litigation was frivolous and in violation of Rule 11, Federal Rules of Civil Procedure.

This litigation was the basis for count 5 of the complaint.

### D. *Abril v. Lewis and Cunningham: Counts 6–9*

In January 1985, while still employed by Abril, Harris contacted attorney M. Byron Lewis and requested assistance in preparing Abril's answering brief in the Globe appeal. Harris sent Lewis portions of the case file, and also filed a notice of association of counsel, naming Lewis as one of Abril's counsel on appeal. After Lewis discovered a conflict of interest in his firm, he returned the file to Harris with a letter explaining the conflict, and advising that he could not assist Harris in the appeal.

Harris then employed John R. Cunningham to assist him in preparing the appellee's brief on Abril's behalf. However, after Abril fired Harris in April 1985 and retained respondent to represent him in the appeal, respondent had that brief stricken by court order on May 31, 1985, and substituted his own brief on Abril's behalf.

Based on these facts, the original complaint in the *Abril v. Harris* litigation alleged a cause of action against attorneys Lewis and Cunningham for "strict liability for unauthorized representation," seeking damages of $1,300,000 plus interest for Abril's "diminished" chances of succeeding on appeal. Lewis subsequently was granted summary judgment on the count naming him as a defendant, and was awarded attorney's fees. Respondent, on behalf of Abril, appealed from the award of fees, and the court of appeals affirmed, also awarding attorney's fees to Lewis and imposing a $1,500 sanction against respondent. Respondent's petition for review on behalf of

Abril to this court was denied, with an award of fees to Lewis for $3,907.50. The count against Cunningham was dismissed with prejudice by stipulation of the parties, with each party bearing their own attorney's fees and costs.

Counts 6, 7, 8, and 9 of the bar complaint arose out of the inclusion of Lewis and Cunningham in Abril's lawsuit against Harris in superior court, the appeal from an order denying a motion for new trial, and the petition for review from the appellate order affirming the trial court.

### E. *Count 14: Actions Through Others*

The final count of the bar complaint alleged that during the Abril lawsuits alleged in counts 1 through 10, and during the dissolution proceedings of Levine & Harris, P.C., from 1981 to 1989, respondent violated the Code and Rules then in effect "by knowingly doing so or doing so through the acts of another."

### III. *Respondent's Violations*
#### A. *Ethical Standard for Frivolous Suits*

On appeal, respondent's first attack against all the counts alleging violations of E.R. 3.1 is that the commission incorrectly applied a subjective standard in determining that various claims were frivolous, rather than an objective standard of the reasonableness of his legal theories. E.R. 3.1 provides:

A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

The Code Comparison to the rule notes that "the test in E.R. 3.1 is an objective test." However, the Comment to E.R. 3.1 also provides:

The action is frivolous, however, if the *client* desires to have that action taken primarily for the purpose of harassing or maliciously injuring a person *or if the lawyer is unable to make a good faith*

*argument* on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law. (Emphasis added.)

■■■ Thus, although the objective reasonableness of a legal claim is the standard to determine whether it is frivolous under E.R. 3.1, the rule also requires a subjective good faith motive by the client[4] and a subjective good faith argument by the lawyer. *See, e.g., In re Mulhall,* 170 Ariz. 152, 153, 822 P.2d 947, 948 (1992) (counterclaim filed in bad faith "establishes a violation of ER 3.1"). Therefore, if an improper motive or a bad faith argument exists, respondent will not escape ethical responsibility for bringing a legal claim that may otherwise meet the objective test of a nonfrivolous claim.

■■■ In the context of civil sanctions, we have similarly utilized an objective test to determine whether an appeal is frivolous under Rule 25, Arizona Rules of Civil Appellate Procedure:[5] if the issues raised are supportable by any reasonable legal theory, or if a colorable legal argument is presented about which reasonable attorneys could differ, the argument is not objectively frivolous. *See Arizona Tax Research Ass'n v. Department of Revenue,* 163 Ariz. 255, 258–59, 787 P.2d 1051, 1054–55 (1989). However, under Rule 25 this objective definition of "frivolous" applies only "[a]bsent an allegation of improper motive." *Id.* at

258, 787 P.2d at 1054. In imposing sanctions pursuant to Rule 25, our courts have analogized the Rule 25 duty to the duty under E.R. 3.1 to avoid claims "for which there is no justification." *See Johnson v. Brimlow,* 164 Ariz. 218, 222, 791 P.2d 1101, 1105 (App.1990).

Similarly, Rule 11 of the Arizona Rules of Civil Procedure requires that "[e]very pleading, motion, and other paper" be certified that "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law, or a good faith argument for the extension, modification, or reversal of existing law; *and that it is not interposed for any improper purpose,* such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." Rule 11(a), Arizona Rules of Civil Procedure (emphasis added). The objective standard of Rule 11 is analogous to the standard of E.R. 3.1. *See, e.g., Smith v. Lucia,* 173 Ariz. 290, 842 P.2d 1303 (App.1992). Thus, a common theme in both our procedural and ethical rules is the examination of whether a claim is frivolous by considering both the objective legal reasonableness of the theory and the subjective motive of the proponent of the claim.

■■■ Moreover, under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) (*Standards*), a respondent cannot be suspended for violat-

---

**4.** Respondent relies on the literal wording of the comment to E.R. 3.1 to argue that only the subjective motive of the *client* is material in determining whether a claim is frivolous. He contends that "[t]here is absolutely no evidence in the record that Anthony Abril, the only client whom Mr. Levine represented in the litigation at issue, desired to harass or injure another person." To the contrary, we find a strong inference in the record that Abril was motivated in part in seeking to strip Harris of a fee in the Globe litigation to punish Harris for telling a reporter about his personal habits and that respondent was aware of that motivation. However, because bar counsel did not contend that these claims were frivolous because of Abril's subjective motive to punish Harris for other events, and neither the committee nor the commission made findings on Abril's subjective intent in bringing suit against Harris, we will not address this issue for the first time on appeal.

We also note, however, that the committee concluded that, as sole controlling party to the professional corporation, respondent was, in effect, the "client" in the P.C. litigation. ("It is accurate to conclude that as a practical matter Respondent sued himself.") To that extent, even under respondent's restrictive reading of E.R. 3.1, respondent's subjective motive as the "client" would become material.

**5.** Rule 25, Arizona Rules of Civil Appellate Procedure, provides:

Where the appeal is frivolous or taken solely for the purpose of delay, ... the appellate court may impose upon the offending attorneys or parties such reasonable penalties or damages ... as the circumstances of the case and the discouragement of like conduct in the future may require.

ing E.R. 3.1 except upon a finding that he *"knows* that he is violating a court order or rule." *Standards,* Standard 6.22 at 42 (emphasis added). "Knowledge" is defined in the *Standards* as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Standards,* Definitions at 17. One commentary has analyzed this "knowing" requirement in relation to the previously quoted "good faith argument" requirement of E.R. 3.1:

> Although "good faith argument" is not a self-defining term, it has come to mean an argument that responsible lawyers would regard as being seriously arguable. Adoption of this standard does not mean that a lawyer's state of mind is irrelevant, for due process concerns dictate that a lawyer not be punished unless his conduct is knowing, and therefore culpable. On the other hand, an objective standard assumes that a genuinely frivolous claim will be known to be frivolous by most lawyers. Indeed, the definition of "knowing" set forth in the Terminology section of the Model Rules states that knowledge "may be inferred from the circumstances." In many cases, therefore, it will be possible to "infer from the circumstances" of a frivolous litigation maneuver that the lawyer had actual knowledge of its frivolous character.

Geoffrey C. Hazard, Jr., & W. William Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* 331 (Student Ed.1985). Thus, the objective test to determine the frivolousness of a claim that would warrant suspension also incorporates both the requirement of a "bad faith argument" by the lawyer under E.R. 3.1 and a "knowing" violation under Standard 6.22. Although the committee inferred respondent's subjective motives from the evidence and commented upon them, it also found his claims "lacking in merit" and without "good faith basis." In our opinion, in its thorough examination of this voluminous record, the committee did not err in considering respon-

dent's subjective motives in determining whether he violated E.R. 3.1.

■ E.R. 3.1 violations aside, in almost every count that alleged a violation of E.R. 3.1, respondent was also charged with violation of E.R. 4.4, which provides:

> In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, . . . .

Thus, even where respondent claims that an objectively arguable ground for a legal claim exists, his subjective purpose in bringing the action is relevant to whether a violation of E.R. 4.4 occurred. Therefore, we find no error in the commission's analysis of respondent's personal motives in bringing these claims in its consideration of whether he had violated E.R. 3.1 and 4.4.

**B.** *Reliance on Prior Judicial Rulings*

Respondent next contends that the committee inappropriately relied on and adopted in its findings various prior judicial rulings in the civil lawsuits made in connection with civil sanctions imposed for frivolous or groundless claims. Indeed, the committee quoted at length from various minute entry rulings awarding attorney's fees and sanctions in both the Levine, P.C., litigation and in the *Abril v. Harris* litigation. However, as bar counsel points out, the committee also tempered its reliance on these prior court rulings, and did not give them preclusive effect. Regarding the P.C. litigation, the committee stated:

> The Committee has made its own determination as to the lack of merit of these matters; it has not given any legal weight to the quoted findings of the trial court in reaching its findings in this disciplinary matter.

Regarding the *Abril v. Harris* litigation, the committee stated:

> *The Committee has given no legal or preclusive effect to the findings and conclusions of the Superior Court* [in *Abril v. Harris* ] but, rather, after considering the evidence presented at the hearing, and the credibility of the witnesses, agrees with the findings quoted above and finds that they were proved at

the hearing of this matter by clear and convincing evidence.

(Emphasis added.) In rejecting respondent's objection on review that the committee's admission of these rulings was improper, the commission stated:

The Commission understands the need for separate civil and disciplinary systems. Given the voluminous record, the detail contained in the court decisions, Respondent's willingness to rely on these decisions when they supported his position, *and* the Committee's assurances that it made independent findings of fact and conclusions of law, the Commission finds no fault with the Committee's references to civil court decisions.

(Emphasis in original.)

On appeal to this court, respondent cites various cases from other jurisdictions to support his proposition that "the weight of judicial authority holds that prior judicial findings should not even be admitted into evidence in disciplinary proceedings." We reject this contention for several reasons. First, respondent stipulated to admission of these findings at the start of the proceedings, and introduced several prior judicial rulings in his own exhibits before the committee. Second, the cases respondent cites are either distinguishable or inapplicable to the proceedings before us. Even in the leading Massachusetts disciplinary case respondent cites, *In re Santosuosso*, 318 Mass. 489, 62 N.E.2d 105 (1945), the court, in discussing the preclusive effect of the proffered evidence, stated:

We are unwilling to attach such conclusive effect to a judgment at law or a final decree in equity, based upon alleged corrupt conduct on the part of a defendant attorney, where the judgment or final decree entered rests upon findings that the attorney has been guilty of corrupt conduct. It may be observed that this was the position taken by the single justice in the present case in connection with his action in overruling the demurrer to the respondent's answer. We concur therein. *But we are of [the] opinion that the evidence in the proceeding in equity in question is admissible in an inquiry such as the present [disciplinary proceedings], and like any other evidence is to be given such weight as the single justice shall deem proper, when considered together with all other evidence that the respondent may produce at the hearing,* in the course of which he must be heard with full opportunity to present all relevant evidence that he may wish to adduce.

62 N.E.2d at 107–108 (emphasis added). Similarly, in other cases cited by respondent, the disciplinary courts merely held that the findings of other courts should not have *preclusive* effect in the disciplinary proceedings. *See, e.g., In re Gygi*, 273 Or. 443, 541 P.2d 1392, 1394–95 (1975) (finding of liability in civil securities suit by preponderance of evidence did not establish by collateral estoppel clear and convincing proof of ethical misconduct); *In re Strong*, 616 P.2d 583, 587–88 (Utah 1980) (hearing committee erroneously accepted findings in civil case of stock fraud and would not allow evidence to impeach or discredit those findings; court remanded for civil evidentiary hearing that could include the record in the prior civil trial); *see also Caldwell v. State Bar*, 13 Cal.3d 488, 119 Cal.Rptr. 217, 223, 531 P.2d 785, 791 (1975) (pleadings, findings of fact and conclusions of law and judgment in civil case regarding breach of respondent's duty to account for trust funds were admissible in subsequent disciplinary action because of "essential identity of the factual issues in both proceedings"); *In re Wilson*, 76 Ariz. 49, 53, 258 P.2d 433, 436 (1953) (transcripts and evidence from trial in underlying criminal action were admissible in disciplinary action).

 In this case, where respondent stipulated to admission of the civil records before the hearing committee, relied on those rulings where they were favorable to his position, and where he had extensive opportunity to present other evidence and expert witnesses to contradict findings that his claims were groundless or frivolous, including examination of one of the superior court judges regarding her reasoning in ruling against him, we find no error in admission of the prior judicial rulings

which accompanied the full documentary history of those civil cases. We find no error because neither the committee nor the commission gave these rulings preclusive effect and because the committee specifically made independent findings and conclusions based on the totality of the evidence before it. The multiple judicial findings, over a course of years, that respondent's various claims were frivolous, groundless, or made in bad faith, were certainly relevant to establish that respondent had notice that some of his theories may not have been considered objectively reasonable or well-founded. In that light, this court will consider those prior judicial rulings as well. We now turn to the individual counts of the bar complaint.

## C. Individual Counts of Misconduct

### 1. Count 1: Filing of Abril v. Harris Complaint

As previously indicated, count 1 of the bar complaint alleged that the filing of the complaint against Harris, Palumbo, and Harris & Palumbo, P.C., in the Abril lawsuit violated E.R. 3.1 and 4.4. This litigation was based on two allegations of wrongdoing by Harris against Abril's interests: first, Harris' execution of the fee agreement with Piatt, and second, Harris' role in assisting Piatt in renewing the Johnson judgments against Abril. Abril's cause of action against Palumbo and, undoubtedly, Harris & Palumbo, P.C., was derivative of his claim against Harris for the judgment renewal, because at the time of the acts complained of, Harris and Palumbo were practicing together.[6]

The suit alleged three causes of action against Harris: breach of contract, bad faith, and a request for a declaratory judgment that Harris take no fees from the Globe litigation.[7] The trial court found that defendants had established that Abril was not damaged by Harris' actions in entering the Piatt fee agreement or in consulting with Piatt regarding the judgment renewals:

> The Court has tried to disregard the animosity which exists between plaintiff's counsel and defendants' counsel. The Court has reflected upon plaintiff's testimony in his depositions. The Court must take as true that a wrong was suffered but no damage sustained. The Court concludes it is a very unusual plaintiff who brings a lawsuit when no loss has been sustained. It is also a very unusual plaintiff who finds fault with an attorney who has been so successful on the plaintiff's behalf. It is a very unusual plaintiff who would be concerned as to whether Harris or Levine & Harris, P.C. is the person or entity which might possibly, in the future, be entitled to a percentage of any recovery from an insurance company.
>
> The Court finds a portion of the case to be groundless. The Court finds a portion of the case was not brought in good faith. The Court finds a portion of the case was brought for harassment purposes. The Court finds this litigation has been motivated more by greed than the desire to rectify wrong. *Because a majority of the case was brought without substantial justification, pursuant to A.R.S. § 12–349, defendants shall be entitled to recover reasonable attorney[']s fees to be assessed against plaintiff's counsel.*

(Emphasis added.)

The committee agreed with these findings, and independently concluded that respondent had "no good faith basis for

---

6. Both bar counsel and the committee pointed out that, if Abril pursued a theory of *respondeat superior* against Palumbo for Harris' actions regarding the judgment renewals, he logically could have pursued a similar theory against both Levine and Levine's professional corporation for Harris' actions in entering the Piatt fee agreement in 1981, when Harris was employed by Levine & Harris, P.C. We do not discuss any potential conflict of interest arising from these facts, because that conduct was not alleged in

the bar complaint. *In re Myers,* 164 Ariz. 558, 562, 795 P.2d 201, 205 (1990).

7. The count for declaratory relief was dismissed without prejudice as premature because the appeal was still pending in the *Abril v. Globe* litigation and Abril had not yet incurred a contingency fee to Harris. Levine refiled the declaratory judgment action in 1987. Count 10 addresses this cause of action.

bringing the lawsuit and, in fact, brought the suit for the selfish motive of obtaining all of the Abril fee in the bad faith suit. The lawsuit was frivolous pursuant to E.R. 3.1, Rule 42, Rules of the Supreme Court."

The commission adopted the findings of the committee, with one exception. The commission disagreed with the reasoning of both the trial court and the committee that Abril was not damaged by Harris' role in renewing the Johnson judgment because an existing excess judgment was necessary to show damages in the Globe bad faith litigation, recognizing that case law supported respondent's contention that "a judgment need not necessarily exist in order to obtain relief in a bad faith suit." *See generally Frankenmuth Mut. Ins. Co. v. Keeley*, 433 Mich. 525, 447 N.W.2d 691 (1989); *Brown v. Guarantee Ins. Co.*, 155 Cal.App.2d 679, 319 P.2d 69 (1957). However, the commission found by clear and convincing evidence that the suit was frivolous under E.R. 3.1 on the basis that "respondent brought the action for improper purposes. The Commission believes Respondent, only after the commencement of the disciplinary proceedings, began embracing the more noble purposes of extending, modifying or reversing the existing law."

On appeal, respondent argues that both the committee and the commission erred in rejecting the opinions of his expert witnesses that the *Abril v. Harris* litigation was not frivolous. All four witnesses testified that they believed the merits of Abril's claims against Harris were objectively well-grounded in legal theory and factual basis. The committee rejected these opinions on the ground that they were based upon insufficient information. The Commission agreed. Respondent argues that these findings were factually incorrect.

The "simple answer" to any allegation that either the committee or the commission misweighed the evidence before it is that this court is the ultimate trier of fact in disciplinary cases. *In re Bowen*, 160 Ariz. 558, 560, 774 P.2d 1348, 1350 (1989),

citing *In re Kersting*, 151 Ariz. 171, 172, 726 P.2d 587, 588 (1986). From our own review of the expert testimony, it is apparent that respondent's witnesses had less than a complete story before them upon which to opine. For example, James W. Hill testified that he was not aware that Harris had agreed to credit Abril with any fees received from Johnson as a result of the Piatt fee agreement. He also "assumed" that the Johnson judgment would have abated but for Harris' assistance. In response to committee questions, Mr. Hill testified that if Harris was not the "moving force" in renewing the Johnson judgments, then Harris "hasn't done anything to the detriment of Mr. Abril."

Similarly, G. David Gage, respondent's strongest expert witness, testified that he had never talked to Abril or assessed his credibility, that he had never been provided with any documentation indicating that Abril might have known of the fee arrangement between Harris and Piatt, and had no knowledge whether respondent had discussed the potential liability of his own law firm with Abril before undertaking representation. Gene Gulinson testified that he was not provided with Piatt's deposition testimony establishing that Piatt called Harris regarding the renewal of the judgments, but that fact would obviate one of the causes of action against Harris. He also conceded that if the fee agreement resulted in Harris' crediting Abril with the Johnson fee payments, then Abril would be benefitted, not harmed, by the Harris-Piatt agreement. Finally, W. Thomas McLaughlin testified that he was not aware from the materials with which he was provided that Abril was credited with the amount Harris received from Johnson, and that he was under the impression that Harris "reminded" Piatt to renew the Johnson judgments.

■ Under these circumstances, we agree with the committee and the commission that the opinions of these experts need not be accorded great weight in establishing the objective reasonableness of Abril's claims against Harris.[8]

---

**8.** We do not address either the propriety or impropriety of the Harris-Piatt fee agreement in

this opinion, as that issue is not before us.

■ In reviewing the record as the ultimate trier of fact and law, and giving considerable deference to the bar's recommendation, we find that the record supports by clear and convincing evidence the above violations on this count. *See In re Cardenas,* 164 Ariz. 149, 151, 791 P.2d 1032, 1034 (1990). Respondent had previously assisted Abril in filing two bar complaints in April and May 1985, based on the same allegations, which the bar had dismissed as without merit. Additionally, respondent wrote a letter to the bar in June 1985 asking for reconsideration of those complaints. The committee properly recognized that the dismissal of a bar complaint does not necessarily preclude a right to file a lawsuit for substantive relief. However, the filing of a complaint based on these same grounds within a few days of the rejection of the bar complaints, seeking $41,300,000 in damages for conduct that was implicitly determined not to injure his client, lends strong support to the improper motive and objective unreasonableness of the theories asserted in the complaint against Harris and Palumbo.

2. *Count 2: Special Action in Abril v. Harris*

■ Count 2 of the bar complaint alleges that respondent's filing of a petition for special action in the court of appeals from the award of attorney's fees in favor of Harris on summary judgment in the Abril litigation violated E.R. 3.1 and 4.4.

The committee found that the special action was "frivolous and totally lacking in merit" because "[a]t the time the Special Action was filed the trial court had not entered a final order on the issues complained of...." The commission also found the special action frivolous, but disagreed with the committee's reasons:

Respondent correctly recognizes that special action proceedings do not require a final judgment.... However, special action proceedings do require the existence of an order, whether the order grants or denies the requested relief. The trial court, when Respondent filed the special action petition, had not entered any order against Respondent

which required that he pay fees.... Under these circumstances, the Commission does not believe the appellate court had anything to review.

On appeal to this court, respondent argues that both the committee and the commission erred in finding his special action frivolous on these grounds. We agree.

Respondent sought special action relief from the trial court's minute entry ruling that "[b]ecause a majority of the case was brought without substantial justification, pursuant to A.R.S. § 12–349, *defendant shall be entitled to recover reasonable attorney['']s fees to be assessed against plaintiff's counsel.*" (Emphasis added.) The primary issues raised in the special action, besides the contention that the claims were not frivolous, were whether the trial court could apply A.R.S. § 12–349 to a cause of action that arose before the effective date of that statute, and whether a judgment for attorney's fees could be imposed against plaintiff's counsel, who was not a party to the action.

Although the minute entry ruling had not been reduced to formal written judgment at the time the special action was filed, the minute entry clearly set forth an intent to impose fees against respondent personally. Special action jurisdiction could properly be invoked to review that "intention." We therefore disagree with the committee that the special action required a "final order," and we disagree with the commission that the special action required a ruling on an application for actual fees.

Furthermore, the issue whether an attorney may appeal as a "party" to the litigation when attorney's fees are personally assessed against him had not yet been decided. This was later resolved as a matter of first impression on appeal in *Abril v. Harris,* 157 Ariz. 78, 754 P.2d 1353 (App. 1987). At the time the petition was filed, special action relief was an objectively reasonable basis to seek relief from a minute entry ruling that attorney's fees were to be awarded against plaintiff's counsel pursuant to A.R.S. § 12–349, on the basis that

the trial court was "threatening to proceed without or in excess of jurisdiction or legal authority." *See* Rule 3(b), Arizona Rules of Procedure for Special Actions; *see also Jacobson v. Superior Court*, 1 Ariz.App. 342, 402 P.2d 1018 (1965) (extraordinary relief now encompassed in special action procedure is a preventive measure). We find no clear and convincing evidence of improper motive or bad faith on the record regarding the filing of the special action, and we therefore find no violation of E.R. 3.1 or 4.4 on count 2.

### 3. *Count 3: Appeal in Abril v. Harris*

Count 3 of the bar complaint alleges that respondent's role in instituting and maintaining the appeal in the *Abril v. Harris* litigation violated E.R. 3.1 and 4.4.

In that appeal, respondent argued that the trial court was legally incorrect in concluding that Abril had not been "damaged" by Harris' participation in Piatt's renewal of the Johnson judgments, because Globe was under no obligation to pay Johnson in the absence of an assignment in the bad faith suit. Prior to that appeal, respondent had filed a motion for new trial, motion to vacate judgment, motion to grant relief from the judgment, and motion to strike applications for award of attorney's fees in the trial court, all of which had been denied. In affirming the trial court, the court of appeals noted:

> We agree with the comments of the trial judge concerning the lack of merit to this case. A reading of the motions filed by appellants indicate the harassing nature of much, if not all, of them. We note that this appeal was filed January 22, 1987. The mandate of Division One of this court in Abril's case against Globe [reversing punitive damages but affirming compensatory damages of $300,000] issued on January 9, 1987. At the time this appeal was filed, Abril and his attorney knew that the judgments in favor of the injured pedestrian would be paid by Globe and that he would suffer no damage. We find this appeal frivolous.

*Abril v. Harris*, 157 Ariz. at 81, 754 P.2d at 1356. The court of appeals awarded appel-lees attorney's fees and costs of $9,418.25 to be assessed against respondent personal-ly.

The committee found by clear and convincing evidence that respondent's conduct violated E.R. 3.1 and 4.4. The commission adopted the committee's findings, and added:

> The Commission believes the rationale which supports the Committee Findings regarding Count One supports the Committee Findings regarding this count. The Commission recognizes the arguments offered by Respondent regarding the absence of any obligation by Globe, the insurer, to satisfy the underlying judgment. The Commission gave import to Mr. Abril's insistence, at all times, that Mr. Johnson receive his money.... The conflict between Respondent's legal position, and Mr. Abril's directions regarding payment, strongly suggests the frivolous nature of Respondent's position.

We agree with the findings of both the committee and the commission on this count. Regardless of whether the Globe award was owed to Johnson or to Abril, Abril consistently insisted that Johnson be paid the full amount of the judgment; whether that payment came from Globe or from Abril did not affect Abril's "damages" as respondent argues. Further, respondent was well aware, prior to filing the appeal, that Abril had not sustained any damages from the Harris–Piatt fee agreement, because Harris was crediting any amounts received from Johnson toward Abril's fees. On this record, we find clear and convincing evidence that respondent violated E.R. 3.1 and 4.4 by the conduct alleged in count 3.

### 4. *Count 4: Petition for Review in Abril v. Harris Appeal*

Respondent petitioned for review of the decision following his appeal in count 3. We declined review, and awarded attorney's fees to defendants in the amount of $1,950. Count 4 of the bar complaint alleges that respondent's conduct in filing the petition for review violated E.R. 3.1 and

4.4. Both the committee and the commission found respondent in violation of those ethical rules without further discussion.

For the same reasons that we find a violation on counts 1 and 3, we find that the record establishes, by clear and convincing evidence, that respondent's pursuing the same theories before the supreme court violated E.R. 3.1 and 4.4.

### 5. *Count 5: Federal Court Litigation*

Count 5 of the bar complaint alleges that respondent's institution and maintenance of the federal suit against Harris and others [9] seeking an injunction to prevent enforcement of the $7,586.25 judgment for attorney's fees imposed against him by the state trial court in the *Abril v. Harris* litigation discussed in count 1 violated E.R. 3.1 and 4.4. Respondent alleged in the federal court:

> That the tenor and effect of the aforesaid Order and Judgment of the aforesaid Superior Court, and the intent of the defendants herein, was to deny [respondent] his right to due process of law and his right to represent, as an attorney at law, a person of a minority group or class in a legal malpractice action by subjecting the plaintiff to recriminations therefore, and by conspiring to assess attorneys' fees against him without any notice or an opportunity to be heard thereon, and by conspiring to apply, under color of law, a statute of the State of Arizona [A.R.S. § 12–349], in a retroactive fashion, with the intent to deprive the plaintiff of his rights under the First, Fifth, and Fourteenth Amendments to the Constitution of the United States.

On February 26, 1987, defendants moved to dismiss the complaint for lack of subject matter jurisdiction, arguing that the state court judgment was not reviewable by the federal district court. In reply to respondent's response, defendants requested attorney's fees pursuant to 42 U.S.C. § 1988 for a defense to a civil rights action which

was "frivolous, unreasonable, or without foundation." On April 20, 1987, respondent filed a motion for voluntary dismissal, stating that "[b]y reason of the fact that the plaintiff now has sufficient funds to post a supersedeas bond to protect his property while he seeks redress in the State appellate courts, and, therefore, the issues raised by the plaintiff in his lawsuit are now moot and plaintiff's action should be dismissed. Accordingly, plaintiff requests that the court issue an Order dismissing this action without prejudice with each party to bear their own costs."

Defendants opposed respondent's motion for voluntary dismissal, again requesting attorney's fees and arguing that "the whole purpose of his Federal suit was to delay the state court proceedings until Plaintiff was able to secure funds to post the bond," in violation of Rule 11, Federal Rules of Civil Procedure. On May 20, 1987, the federal judge dismissed the action with prejudice, and granted defendants an award of $500 towards their attorney's fees, for the following reasons:

> The court also finds sanctions are appropriate against the plaintiff under Fed. R.Civ.P. 11. In his complaint, the plaintiff alleges the defendants conspired with the Superior Court judge to assess fees against the plaintiff personally. The complaint fails to specify however, how the defendants conspired with the judge nor at oral argument could he adequately propound a plausible theory. A reading of the complaint merely shows the defendants wished to execute on the state court judgment against the plaintiff. *It is clear that plaintiff had no basis to allege that a conspiracy existed and therefore sanctions are appropriate under Rule 11....*

(Emphasis added.)

The committee found that "the only basis for the federal court lawsuit was Respondent's penurious state and that there is no evidence that the named defendants and the Superior Court judge engaged in a con-

---

**9.** Respondent also named as defendants in the federal suit Daniel Cracchiolo, Edwin D. Fleming, Burch & Cracchiolo, P.A. (Harris' attorneys in the Abril suit); Hartford Fire Insurance Co. and its Affiliates (Harris' malpractice carrier); Anthony J. Palumbo; Harris & Palumbo, P.C.; and R.G. Godbehere, in his official capacity as Sheriff of Maricopa County.

spiracy," and found by clear and convincing evidence that respondent had violated E.R. 3.1 and 4.4. The commission adopted the committee's findings, further stating that it believed respondent "had a full and fair opportunity to argue about an award of attorney's fees" in the Abril matter.

On appeal, respondent argues that the federal suit was not frivolous because case law exists to support his theory that imposition of attorney's fees against a lawyer personally without prior notice and an opportunity to be heard violates due process. *See, e.g., Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.*, 834 F.2d 833, 835–37 (9th Cir.1987). He also argues that the federal court dismissed his suit not for failure to state a claim, but because of the abstention doctrine of *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 6–8, 107 S.Ct. 1519, 1523–24, 95 L.Ed.2d 1 (1987).[10]

Respondent's arguments overlook the fact that the underlying basis for his federal suit was an allegation, unfounded by any evidence, of a "conspiracy" between the superior court judge and the defendants to violate his due process rights, which was not an objectively reasonable legal theory under the facts. Additionally, respondent has freely admitted that his subjective purpose in bringing the federal suit was to delay enforcement of the state court judgment until he could raise funds for a supersedeas bond, and when this was accomplished, he sought dismissal of the federal action. We have no difficulty in adopting the findings of the committee and commission as supported by clear and convincing evidence, and find respondent in violation of E.R. 3.1 and 4.4 on count five of the bar complaint.

### 6. *Counts 6–8: Abril's Claims Against Lewis*

Counts 6, 7, and 8 of the bar complaint alleged that respondent's institution and maintenance of the suit, appeal, and petition for review of Abril's claims against attorney M. Byron Lewis violated E.R. 3.1 and 4.4.

The original complaint filed in the *Abril v. Harris* litigation asserted a cause of action against Lewis based upon a theory of "strict liability for unauthorized representation," and sought damages of $1,300,000. As previously indicated, the sole involvement of Lewis in the Globe appeal was to ascertain that he could not undertake the offered appellate assistance because of a conflict of interest in his firm.[11]

On May 31, 1985, respondent phoned Lewis and advised him that Lewis had been named as a defendant in Abril's suit, and would soon be served with process. Lewis informed respondent of the above facts regarding his limited involvement, and respondent advised him that "he would look into the matter and would probably be dismissing the lawsuit" as to Lewis. On June 3, 1985, Lewis wrote to respondent, memorializing their phone conversation; he also indicated that no fees were generated to either Harris or Abril as a result of his receipt of the materials from Harris. Lewis' letter concluded:

> Based on this information, it is my understanding that you will have me dismissed as a defendant from this lawsuit. Due to the fact that I currently have some financing pending with First Federal for some remodeling work I am having done to my home, I would appreciate it if you would make arrangements for immediate dismissal of this lawsuit as to me. Otherwise, it may show up as a contin-

---

**10.** On April 6, 1987, while the defendants' motion to dismiss was still pending but after the reply had been filed, the United States Supreme Court issued its opinion in *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 10, 107 S.Ct. 1519, 1525, 95 L.Ed.2d 1 (1987), holding that the federal district court in that case should have abstained from considering a suit seeking to enjoin enforcement of a state court judgment under the doctrine in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**11.** Lewis received only the following public records from the Abril litigation: Notice of Appeal, Notice of Satisfactory Arrangements for Court Reporter Payment, Bond for Costs on Appeal, minute entry settling supersedeas bond, Supersedeas Bond, Motion for New Trial and Response.

gent liability on a credit check which could hinder the First Federal financing.

Respondent testified that when Abril read the letter from Lewis indicating Lewis had a conflict of interest, "that kind of just caused [Abril] again to go up the wall," because that was the basis of his complaint against Harris regarding the Piatt fee agreement, and Abril would not let respondent dismiss Lewis from the suit. Lewis called respondent 18 or 19 days after the complaint was filed, and respondent advised that he was not going to dismiss Lewis from the suit. Abril testified that he believed that Lewis had files in his possession that were "essential to the case," that would cause him to lose the Globe appeal.

On July 23, 1985, Lewis moved for summary judgment and requested an award of costs and fees, arguing that, even if a cause of action for unauthorized representation existed, the undisputed facts established that he never "represented" Abril, having declined representation after performing a conflicts check. He also argued that, because respondent knew of this limited involvement, he should be assessed attorney's fees under A.R.S. § 12–341.01(C) and Rule 11 for a frivolous, vexatious, bad faith claim. Respondent responded that "plaintiff is agreeable to a dismissal provided that said dismissal is without the imposition of attorney's fees and costs upon either the plaintiff or plaintiff's counsel," but argued that Lewis was liable under the theory of unauthorized representation set forth in *Journal–Miner Publishing Co. v. Curley*, 31 Ariz. 280, 252 P. 187 (1927).

In granting summary judgment in Lewis' favor, the trial court found the claim against Lewis "was known by the plaintiff and his counsel to be groundless after a telephone conversation with Lewis on May 31, 1985, and after receipt of a letter from Lewis dated June 3, 1985." The court concluded that Abril had failed to support his legal theory of strict liability for unauthorized representation. The court granted fees after finding that the suit against Lewis was frivolous, that respondent had shown no facts from which he could surmise Lewis held confidential information,

and that the suit constituted harassment. Respondent then filed a Motion for a New Trial, as well as a Motion for Reconsideration and Motion for a New Trial Regarding Award of Attorney's Fees, challenging the court's finding of bad faith and the award of fees; all of these motions were denied. The trial court awarded $3,455.50 in fees to Lewis against Abril.

Respondent appealed only from the award of fees. His appeal was based only on the claim that his suit against Lewis was not frivolous or groundless. The court of appeals affirmed, and awarded attorney's fees pursuant to A.R.S. § 12–341.-01(C) and § 12–349. *Abril v. Lewis*, 2 CA–CV 87–0023 (Ariz.App. mem. dec. filed May 12, 1987). The court awarded Lewis attorney's fees of $7,373.75 and costs, and $1,500 in damages against respondent personally. Respondent then filed a petition for review with this court, which was denied, with an additional award of fees to Lewis of $3,907.50.

In finding the claim against Lewis to violate E.R. 3.1 and 4.4, the committee remarked:

> [F]rom the outset the incredible number of motions, papers, the appeal and the petition were generated solely to avoid the sanction of fees and costs. Lewis' law firm was compelled to pay approximately $13,000 in fees to Lewis' lawyer to successfully defend what the Committee finds to be a wholly frivolous and groundless action....
>
> Respondent relies on *Journal–Miner Publishing Company v. Curley*, 31 Ariz. 280, 252 P. 187 (1927) as support for naming Lewis in the lawsuit.... The Committee's reading of *Journal–Miner* finds that an employed attorney does have the authority to hire associate counsel but without ratification of such hiring by the client the associate counsel can only look to the hiring lawyer for compensation, not to the client. See 31 Ariz. at 283 [252 P. at 188]. Respondent's reading of the case is not supported by the language of the case itself.

The commission adopted the findings of the committee, further noting:

The Commission finds Respondent's conduct, with respect to Byron Lewis, especially egregious.... Mr. Lewis conducted himself properly throughout his brief involvement in this matter. Still, Respondent sued him.... Respondent cannot demonstrate an unauthorized representation by Mr. Lewis, even if a cause of action for unauthorized representation exists or could exist under an extension of existing law.

On appeal, respondent argues that the committee and commission erred in considering that respondent's motive in continuing with the claim against Lewis was avoidance of the fees, because the only conduct charged in count 6 is "the act of filing the complaint in the first instance." This statement is factually incorrect: the complaint clearly charges respondent with instituting and *maintaining* the claim against Lewis in the trial court, on appeal and on review. Respondent's actions during the entire litigation could therefore be considered.

We agree with the findings of the committee and commission regarding counts 6, 7, and 8. Respondent's institution of the claim against Lewis was not objectively reasonable under the theory of *Journal–Miner*, which involved the issue of a client's obligation for payment of fees to an unauthorized associate counsel, nor was it reasonable given the facts of Lewis' limited involvement with Abril's appeal. Lewis was harassed for over two years by this unfounded and unreasonable claim, during which time respondent was made aware consistently, by every court that considered the matter, of the groundless nature of this claim. The record contains clear and convincing evidence that respondent violated E.R. 3.1 and 4.4 as charged in counts 6, 7, and 8 of the bar complaint.

### 7. *Count 9: Abril's Claims Against Cunningham*

Count 9 of the bar complaint alleges that respondent's institution and maintenance of the suit against attorney John R. Cunningham on behalf of Abril violated E.R. 3.1 and 4.4.

As with Lewis, the cause of action against Cunningham was for strict liability for unauthorized representation. Count 9 of the bar complaint was based on the following facts.

As previously indicated, Cunningham had been employed by Harris to assist with the appellate brief in the Globe appeal. Harris agreed to pay Cunningham directly for his work; Abril was not to be billed for Cunningham's work. Harris testified that Cunningham spent "an enormous amount of time" on the brief.

Harris testified that Abril fired him a few days before the brief was due; Harris did not feel that respondent could prepare an appropriate brief on such short notice, and, because he was still counsel of record, Harris testified: "I was very concerned about protecting that judgment. I was concerned about it, quite frankly, about protecting it for me, because I had what I believed to be a vested, accrued interest in 1.3 million dollars." Cunningham testified that he did not believe Abril had an absolute right at that point to fire Harris because of Harris' contingent interest in the judgment. Because Cunningham and Harris were still counsel of record in the court of appeals, Cunningham felt, "in my opinion we had not only a right but a duty on behalf of the client as counsel of record to proceed with our representation."

Cunningham testified that, shortly before the brief was filed, respondent called him, "advising me that he was going to be taking over as Abril's counsel, and asking if I would be interested in continuing my association but with him as opposed to with Harris & Palumbo." Cunningham declined.

On August 5, 1985, Kenneth J. Sherk, Cunningham's counsel, and respondent agreed by phone to enter into a stipulation for dismissal with prejudice, with each party to bear their own fees and costs. On August 8, Sherk sent a proposed stipulation to respondent, which included respondent's concession that "there was not nor is there now, a valid claim, in fact or law, against defendant John R. Cunningham...." On August 16, respondent re-

turned the unsigned stipulation to Sherk, with the following explanation:

I cannot in good faith sign the Stipulation which you proposed for several reasons. First of all, the language of the order is not true. Secondly, it could expose my client and myself to a separate lawsuit in tort for abuse of civil process or malicious civil prosecution. Thirdly, I certainly don't want to give Judge Hendrix the erroneous impression that my client or I go around filing lawsuits against people for no reason. Such an impression could prejudice my client's case against the remaining defendants.

On September 10, 1985, Sherk sent respondent a revised form of stipulation, providing that Cunningham would not only waive his claim for attorney's fees and costs, but also for "any claim for damages." Sherk also noted that the trial court had dismissed Lewis and granted attorney's fees, and that, if respondent did not sign the stipulation without further delay, Cunningham would also move for summary judgment with an award of fees and costs under A.R.S. § 12–341.01(C) and Rule 11. On September 13, respondent replied:

I, of course, will leave to my client the final decision as to whether or not to sign your proposed Stipulation. All I can tell you is that I do not like the form that you have proposed, because it ask[s] me to stipulate to an Order that contains language that is not true. There was and is a valid claim against John R. Cunningham for willfully undertaking to represent my client after he had actual notice that he had been discharged[.] I believe that his conduct violated Rule 29(b) of the Rules of the Supreme Court and subjects him to liability to my client.

As I have told you many times, my client is willing to dismiss your client with prejudice with each party to bear their own costs but with no other agreement or stipulation of any kind. If this is not agreeable to your client, I certainly don't have any objection to his remaining in the litigation if he insists on this.

On December 6, 1985, after Sherk had noticed Abril's deposition at his office, Sherk again returned the proposed stipulation to respondent. On December 13, respondent replied:

My client will not authorize me to sign your proposed Stipulation, but wishes me to proceed with a motion for summary judgment and to seek attorney's fees and costs, by reason of the defenses which you interposed in this matter which have caused my client unnecessary delay and a needless increase in the cost of this litigation.

On December 19, 1985, Sherk deposed Abril, who testified that he had never spoken to Cunningham, nor paid him any fees. Abril had left the decision whether to dismiss Cunningham to respondent, in "his best judgment." On December 26, 1985, Sherk spoke to respondent again about the stipulation; they agreed to change the language to indicate that no valid claim existed against Cunningham at the present time, because respondent was concerned about potential Rule 11 violations and state bar disciplinary proceedings if he conceded that there never was a valid claim against Cunningham. On January 16, 1986, the parties signed the stipulation, and on January 21, 1986, the trial court ordered Cunningham dismissed from the suit.

Sherk testified that his fees for representation of Cunningham in this matter totalled $9,700.65, which was paid for by Harris' malpractice carrier. Cunningham testified that his inclusion in this suit had a financial impact on him both personally and professionally because he was required to report the suit to his malpractice carrier for a five-year period, and the suit caused a "tremendous amount of trouble" with his mortgage lender while he was purchasing a home in late 1985, and "untold grief" in getting his family moved into their new home.

In finding ethical violations on this count, the committee noted the long delay in respondent's dismissal of Cunningham after respondent had conceded that Abril had no claim, and noted, "Respondent's actions in pursuing Cunningham are truly perplexing in light of Respondent's attempt to hire Cunningham to continue to prepare the Abril brief after Harris was discharged by

Abril." The committee concluded, "there was no good faith basis to file suit against Cunningham, the suit was frivolous and the delay in dismissing the case was due to Respondent's selfish motive of avoiding sanctions and his apprehension of a bar complaint." The commission adopted the committee's finding and, in addition, noted, "The Commission finds the suit against Mr. Cunningham only *slightly* less offensive than the suit against Mr. Lewis, as Mr. Cunningham did provide legal services on behalf of Mr. Abril." (Emphasis in original.)

On appeal, respondent argues again that, because the commission expressly recognized that a cause of action for unauthorized representation might reasonably be argued, no ethical violation for a frivolous claim can exist. He also argues that the commission erred in considering respondent's personal motives. As we have previously discussed, respondent's motives are relevant to whether he presented a good faith claim. Furthermore, even assuming, without deciding, that the legal basis of the claim against Cunningham was objectively reasonable when made, we find that respondent's actions in delaying the dismissal for months after he had acknowledged he had no claim against Cunningham violated E.R. 3.1 and 4.4. We therefore agree with the committee and commission that the ethical violations in count 9 were established by clear and convincing evidence.

8. *Count 10: Respondent's Suits Against Harris*

Count 10 of the bar complaint, as amended, charged that respondent's actions in instituting and maintaining the Levine, P.C. litigation (P.C. litigation) in April 1983 against Harris, Palumbo, and their professional corporation, violated former Rule 29, DR 7–102(A)(1) [12] and DR 7–102(A)(2). [13] This count also alleged that respondent's actions in 1987 in refiling a portion of Abril's action for a declaratory judgment seeking to deprive Harris of the *Abril* fee, which had been previously dismissed without prejudice, violated E.R. 3.1 and 4.4.

We have previously discussed the multiple suits that respondent filed arising out of the breakup of his seventeen-month relationship with Harris. After unsuccessfully pursuing arbitration appeals and bar complaints, respondent, as sole shareholder and director of his professional corporation, instituted suit on behalf of the professional corporation in superior court against himself, his wife, Harris, Palumbo, their wives, and their professional corporation.

Respondent's reason for pursuing modification of the arbitration award through the courts was that the award was unenforceable because it did not specify a sum certain nor give a description of the specific assets awarded him. [14] He brought the additional 1983 P.C. litigation against Harris and Palumbo because he did not believe the professional corporation was a "party" to the arbitration litigation, and that the corporation had an independent right to a determination of its property rights in the assets divided by the arbitration award. He believed the P.C. suit "was kind of a technical kind of lawsuit. It was not a lawsuit and [I] never looked upon it as being anything other than a determination of property rights," and he noted that another attorney

---

**12.** Former DR 7–102(A)(1) provided:
(A) In his representation of a client a lawyer shall not:
(1) File a suit, assert a position ... or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.
Former Rule 29, Rules of the Arizona Supreme Court.

**13.** Former DR 7–102(A)(2) provided:
(A) A lawyer shall not:
(2) Knowingly advance a claim ... that is unwarranted under existing law....

Former Rule 29, Rules of the Arizona Supreme Court.

**14.** The arbitration award provided that, except for $7,300 awarded to Harris, and except for the division of pending contingency fees from clients, "assets of the partnership and/or the professional corporation known as Levine & Harris not otherwise provided for herein shall remain the property of Jack Levine and/or his professional corporation." The arbitrator also found that "Levine & Harris, P.C., consisted of a partnership between Jack Levine and John D. Harris which was in existence for approximately 17 months."

initially represented the corporation in that action.

Additionally, in 1987 respondent refiled, on behalf of Abril, the declaratory judgment portion of the *Abril v. Harris* litigation that had been previously dismissed without prejudice as premature.[15]

After years of litigation, Harris and Palumbo eventually prevailed with sanctions against respondent for frivolous and harassing suits. In granting summary judgment for defendants in the consolidated litigation and awarding fees against respondent, the trial court specifically found that respondent's claims constituted harassment, were groundless and not made in good faith. It further found that the legal theories present were minimal, and that Harris had requested fees in the sum of $196,304. The trial court awarded $150,000 in fees against respondent, his wife, and his professional corporation.

In finding these suits frivolous and brought in bad faith, the committee also determined that the suit "resulted from Respondent's desire to secure for himself the fee for Harris' work in Abril's bad faith case." The committee found by clear and convincing evidence that respondent's conduct in filing the P.C. litigation in 1983 violated former Rule 29, DR 7–102(A)(1) and DR 7–102(A)(2), and that respondent's conduct in refiling the 1987 Abril suit violated Rule 42, E.R. 3.1 and 4.4.

We agree with the findings of the commission on this count. The claims asserted in the 1983 P.C. litigation had been finally and fully litigated in the arbitration award, which had been confirmed by the superior court, affirmed in the court of appeals, and was the subject of a judgment on mandate; as the trial court correctly concluded, those claims were *res judicata* as to the professional corporation. We find incredible respondent's contention that he believed his professional corporation was not a "party" to the arbitration. We further find outlandish his argument that he cannot be held accountable for the P.C. litigation because he did not act as the corporation's attorney on the case. As the committee pointed out, no evidence was presented that anyone other than respondent had control over the professional corporation. Furthermore, we agree with the committee's conclusion that respondent continued the Abril litigation in 1987 not in the interests of his client, but to claim for himself Harris' portion of the contingency fee in that case.

In the nine years of this litigation, respondent exhibited unusual animosity toward his former partner and his associates, coupled with a concerted refusal to acknowledge the unreasonableness of his legal position in pursuing these claims. As the commission noted, respondent's actions "caused the expenditure of substantial sums, by lawyers, insurance companies and the court systems." The ethical violations alleged in count 10 of the bar complaint are supported by clear and convincing evidence.

### 9. *Count 14: Actions Through Others*

As originally pleaded, count 14 of the bar complaint alleged:

> During the course of the lawsuits instituted on behalf of Anthony Aleman Abril, Jr., set forth in Counts 1–10 above,

---

**15.** We consider Abril's renewed action in 1987 against Harris to be, in reality, respondent's claim against Harris, as the trial court implicitly found in consolidating it with the P.C. litigation. As Harris pointed out in his motion for summary judgment on that claim:

> Abril's claim against Harris essentially prays for a declaration that Abril is not indebted to Harris for any fees earned as a result of Harris' representation of Abril in the Globe American case. It is undisputed, however, that the fees at issue were earned by the firm of Levine & Harris, P.C. and that Mr. Levine's and Mr. Harris' individual entitlement to their respective portion of the fee is governed by an arbitrator's award binding Mr. Levine and Mr. Harris. It is also undisputed that the fees at issue were paid to Mr. Levine, as custodian for Levine & Harris, P.C., pursuant to the arbitration. It is further undisputed that Abril did not contest the payment of the fees to Levine. Finally, it is uncontested that Harris makes absolutely no claim *to Abril* for the fees earned, but rather, makes a claim for his portion of the fees to Mr. Levine, as custodian of the fees as agreed between the parties and as set forth in the arbitration.

(Emphasis in original.)

and through the dissolution proceedings of Levine and Harris, P.C., since 1981 through and including September 6, 1989, you have violated or attempted to violate the Rules of Professional Conduct and Code of Professional Responsibility then in effect by knowingly doing so or doing so through the acts of another.

Your conduct violates Rule 29 of the Arizona Rules of the Supreme Court then in effect at the time, specifically DR 1–102 and 9–102 and Rule 42 of the Arizona Rules of the Supreme Court, specifically E.R. 3.1 and 4.4.

On the sixth day of testimony before the committee, bar counsel amended the complaint to change the violation of E.R. 4.4 to a violation of E.R. 8.4,[16] due to a typographical error.

Both the committee and respondent expressed confusion about the scope of this count throughout the proceedings. Addressing counts 13 and 14 in his opening statement, respondent stated, "I submit it really does amount to a ... denial of due process ... for me or anyone to have to defend against allegations that are almost nine years old."[17] Bar counsel, during his opening statement, explained that count 14 was "an overlying count." He later explained that count 14, "in essence combines the previous counts alleging that the course of conduct by Mr. Levine throughout these proceedings has been in violation of the Ethical Rules and the Disciplinary Rules then in effect at the time." No explanation was offered as to how count 14 added any further allegation of misconduct to the previously alleged counts.

After several days of testimony, a committee member questioned whether any of the counts included misconduct regarding that portion of the *Abril v. Harris* suit seeking a declaratory judgment that Harris should not be entitled to attorney's fees in the Globe litigation. Bar counsel responded that that portion of the Abril suit was included in count 14, because count 14 "relates to the entire activity of Jack Levine."

At the end of the sixth day of testimony, after respondent had finished his direct testimony on all the counts except for count 14, bar counsel stated, "the thrust of Count 14 is the declaratory judgment action filed by Mr. Abril that had been previously dismissed." The following dialogue then occurred between bar counsel and the committee members:

MR. CASE: Clarify for me, please, before we start, what lawsuit does Count 14—

[BAR COUNSEL]: Count 14 is a lawsuit—let me explain that—is a count that alleges the conduct encompassed by the first 13 counts. Specifically in that count it deals with cause number ... [CV] 87–05413 [Abril's second declaratory judgment action against Harris].

MR. COPPLE: I think part of our concern in trying to figure out the allegation in Count 14 just says during the course of the Abril lawsuits alleged or set forth in Counts 1 through 10.

[BAR COUNSEL]: Right. If you look at Count 10 itself it mentions the consolidated actions including CV 87–05413.

MR. COPPLE: So what you are doing in essence is realleging the misconduct or the allegations in 1 through 10 and saying that he did that through Mr. Abril?

[BAR COUNSEL]: Right.... He has answered all of them, the discussion of the Cause Number 87–05413.

MR. COPPLE: Okay. As I read that then, *my understanding of that as a Committee member, Jack, is that the State Bar has limited the allegations under Count 14,* that whatever misconduct was alleged against you in 1 through 10 individually, that *now they say that was also misconduct by doing it through Anthony Abril;* is that cor-

---

**16.** E.R. 8.4(a) provides, in part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another....

Rule 42, Rules of the Arizona Supreme Court.

**17.** On this basis, the committee did dismiss the allegations of count 13, "due to the passage of time between the events complained of and the date of the Hearing."

rect? Because you say through the acts of another.

[BAR COUNSEL]: Uh-hum, that is correct.

....

MR. COPPLE: Okay. If that's the way the State Bar is telling us it [interprets] Count 14, *then I think your testimony need only be limited to your position. Did you try to do all of this through Anthony Abril?*

MR. LEVINE: ... Are we not going to deal with the second declaratory judgment action?

[BAR COUNSEL]: Well, yes, let me explain, and I will take some blame for the confusion in here. Count 10 originally as alleged was to encompass the series of consolidated actions in this case. Upon my review of the notes and the evidence that I had to compile I realized that I wanted to, in fact, limit the discussion in that particular count to the Cause Number 485866.

It is my contention and understanding that the cause number which is the declaratory judgment action could also be encompassed under either Count 10 or Count 14 since that was all part of the consolidated actions. The cause number which is the declaratory judgment action in CV 87–05413, which are Exhibits 95 through 104, are simply the reallegation of the declaratory judgment action that existed in the original complaint in 546215 which makes up Counts 1 through 4. But merely when the court dismissed that without prejudice, that was reasserted in the new Cause 87–05413. Now Mr. Abril is being represented by Mr. Levine in this action.

MR. LEVINE: All right. I'd like to testify to clarify this, because I know what he's getting at. I think I can explain it and get it clear in your minds.

Because of the lateness of the day, however, respondent's testimony regarding this count was continued until the next hearing date, six days later. Before respondent's testimony, bar counsel moved to amend count 14 as noted above, without objection from respondent. Bar counsel further clar-

ified the relationship of the other counts to count 14, changing his position from the previous hearing:

[BAR COUNSEL]: Count 10—let me preface this just briefly. Count 10 was to deal with ... the activities that arose from the consolidated actions, specifically there were two cause numbers that were to be brought before the Disciplinary Committee, Cause Number 485866. The other cause number was CV 87–05413.

Previously I had indicated that the evidence under CV 87–05413 could come in under Count 14. That was erroneous in talking about that in the fact that I think Friday, at the end of the day I was being questioned on it, and that's erroneous.

Bar counsel then amended count 10 to include the second declaratory judgment action by Abril, CV 87–05413, as a violation of E.R. 3.1 and 4.4.

When respondent began his testimony regarding count 14, he mentioned cause number CV 87–05413, the second Abril declaratory judgment action against Harris, and explained, "which is the subject of Count 14," without correction from bar counsel or the committee. At the end of his testimony about that action, he concluded his presentation of evidence.

In closing argument, bar counsel argued: That's what Count 14 is about. It's the use of Mr. Abril or the use of Mr. Thrasher or the use of Mr. Cohen [in the P.C. litigation] to conduct or circumvent the rules of—the Disciplinary Rules or to violate the Ethical Rules.

In making his recommendation for sanctions, bar counsel stated:

Count 14, since it is merely a reiteration of the counts of 1 through 10, it's the same recommendation as to counts 1 through 10.

In its report, the committee made the following relevant findings regarding count 14:

Count 14 alleges that Respondent violated the ethical rules by using others to circumvent the rules in filing the actions specifically set forth in Counts 1 through 10. *Bar counsel argues that Respon-*

*dent committed ethical violations through the use of others to be counsel to his professional corporation* and by using Abril as a nominal plaintiff when the lawsuits were actually for Respondent's benefit.

*The Committee finds that Respondent's conduct in having his professional corporation sue Respondent and Harris* for among other things conversions and breaches of fiduciary duty is conduct which violates Ethical Rules 8.4(a), (c), and (d).... The Committee finds that the violation of E.R. 8.4(c) is that of misrepresentation; the misrepresentation being the allegation of serious breaches on the part of Harris which Respondent knew to be false.

(Emphasis added.) The committee also found the damages request in the original complaint in *Abril v. Harris* to be "absurd monetary claims" that damaged the original defendants in that suit by making it difficult for them to obtain malpractice insurance, and found by clear and convincing evidence, without further discussion of the client's involvement, that "Respondent's conduct set forth in Counts 1–10 violates E.R. 3.1 and E.R. 8.4, Rule 42, Rules of the Supreme Court and DR 1–102,[18] former Rule 29." Regarding count 14, the commission adopted the findings of the committee without discussion.

On appeal, respondent complains that count 14 "does not identify any specific conduct that is alleged to be improper," and fails to give respondent due process notice of its scope. The state bar merely responds that the committee's findings "speak for themselves."

Given the above history of the confusion regarding the scope of this count by not only the committee but bar counsel, we must agree with respondent that count 14 fails to adequately charge respondent with

the misconduct that the committee found on this record. As originally charged, count 14 added nothing to the allegations already contained in counts 1 through 10 of the complaint. However, bar counsel's belated attempt to amend the count to charge a violation of E.R. 8.4 added a new theory that the conduct in counts 1 through 10 were also unethical as performed "through the acts of another." This might have been a viable theory on this record if bar counsel had not limited and changed the scope and breadth of count 14 continually through the hearings until it became, in our opinion, almost incomprehensible to defend against, as evidenced by respondent's belief, after long discussion over several days, that count 14 now alleged only the second Abril suit for declaratory relief against Harris, and as also evidenced by the committee's apparent confusion about which lawsuits were included in count 14.

Bar counsel has the discretion to move to amend a bar complaint to conform to the proof or to include further charges at any time before or during the disciplinary hearing; however, respondent must be given a reasonable opportunity to respond to the amendment. Rule 55(a), Rules of the Arizona Supreme Court. We normally will not invalidate a finding of misconduct by the committee due to a technical error in bar counsel's pleading. Rule 54(i), Rules of the Arizona Supreme Court. However, a greater concern guides us in this circumstance: a lawyer has the right to procedural due process in a disciplinary proceeding. *In re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *In re Myers*, 164 Ariz. 558, 795 P.2d 201 (1990); *In re Riley*, 142 Ariz. 604, 691 P.2d 695 (1984).

In *Riley*, we construed the procedural due process guarantee in *Ruffalo* to allow amendment to a bar complaint during

---

**18.** Former DR 1–102 provided:

(A) A lawyer shall not:

(1) Violate a Disciplinary Rule.

(2) Circumvent a Disciplinary Rule through actions of another.

\* \* \* \* \* \*

(4) Engage in conduct involving ... misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice.

the proceedings to add additional violations if respondent had ample opportunity to respond. 142 Ariz. at 609, 691 P.2d at 700. Additionally, *Ruffalo* requires that such amendment not be based upon respondent's testimony prior to his knowledge of the amended allegations. 390 U.S. at 551, 88 S.Ct. at 1226. In *Myers*, we found that, absent such amendment and opportunity to respond, elemental due process would be violated by finding that respondent had committed uncharged ethical violations. 164 Ariz. at 562, 795 P.2d at 205. Here, an allowable amendment was made, but charged a violation so broad and vague that extensive and inconclusive explanation was required throughout the proceedings to unsuccessfully define its scope. Under these circumstances, count 14 did not meet procedural due process by giving respondent either notice of the alleged acts of misconduct or any realistic opportunity to defend himself against them. We therefore do not accept the commission's findings as to this count, and we strike count 14 from the amended complaint.

## IV. SANCTIONS

### A. *Standards for Determining Sanctions*

■ This court gives great weight to the recommendations of the committee and commission; however, we are ultimately responsible for determining the appropriate sanctions. *In re Lincoln*, 165 Ariz. 233, 235, 798 P.2d 371, 373 (1990); *In re Neville*, 147 Ariz. 106, 108, 708 P.2d 1297, 1299 (1985). In making that determination, we are guided by the purpose of disciplinary proceedings, which "is not to punish the lawyer, but to protect the public and deter similar conduct by other lawyers." *In re Rivkind*, 164 Ariz. 154, 157, 791 P.2d 1037, 1040 (1990). An additional goal of the disciplinary system is to preserve the public's confidence in the integrity of the bar. *In re Hoover*, 161 Ariz. 529, 534, 779 P.2d 1268, 1273 (1989).

■ For further assistance, we may look to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1986) (*Standards*), which we consid-

er a "useful tool in determining the proper sanction." *In re Cardenas*, 164 Ariz. 149, 152, 791 P.2d 1032, 1035 (1990). Under the *Standards*, before imposing sanctions the court should consider:

(a) the duty violated;

(b) the lawyer's mental state; and

(c) the potential or actual injury caused by the lawyer's misconduct; and

(d) the existence of aggravating or mitigating factors.

Standard 3.0; *see In re Anderson*, 163 Ariz. 362, 365, 788 P.2d 95, 98 (1990).

In this case, the nature of the duty violated was respondent's abuse of the legal process. Standard 6.2 applies to such ethical violations. The subsections of that standard establish what the appropriate sanctions should be based on respondent's state of mind and the extent of injury to others. Thus, disbarment is appropriate when the violation is intentionally committed. *See* Standard 6.21, Commentary. Likewise, suspension is appropriate "when a lawyer *knows* that he is violating a court order or rule, and there is injury or potential injury to a client or a party, or interference or potential interference with a legal proceeding." Standard 6.22 (emphasis added). If the violation is merely the result of negligence, reprimand is generally appropriate. Standard 6.23.

The committee addressed respondent's state of mind as follows:

Unfortunately the Respondent has engaged in a near decade long quest to make Harris and Palumbo pay for imagined faults, breaches and lapses. There is no evidence that Harris, Palumbo or the other individuals and entities which suffered as defendants in suits prosecuted by Respondent deserved to be pursued for anything....

The Committee is simply astounded that Respondent did not wake up to his blind spot when faced with sanction after sanction and rebuke after rebuke over a period of many years.

We have previously held that actual knowledge of a frivolous litigation may be inferred from the circumstances. *See* sec-

tion III(A), *supra.* Although the committee found evidence that respondent sincerely disagreed with most of the court rulings against him, the commission concluded that:

> Respondent justified many of his acts by his reliance on his client's instructions. Respondent, with his many years of experience in the legal profession, knows, or should know, that improper conduct, whether or not directed by a client, constitutes improper conduct.

The commission rejected respondent's argument that he did not possess the requisite "knowledge" to receive a sanction of suspension.

We agree that the evidence in this record is clear and convincing that respondent knowingly pursued frivolous claims. Respondent was repeatedly sanctioned at every judicial level for his objectively groundless claims; whether those rulings were substantively correct or not, they would certainly give a reasonable lawyer conscious awareness that his continuing conduct based on the same claims might be considered culpable under the ethical rules. *See* Hazard, *supra,* at 331. Thus, despite respondent's protestation of his sincerity in making these claims, we can infer sufficient knowledge that suspension is warranted under the standard. Moreover, we agree with bar counsel that the committee's characterization of respondent's "blind spot" was in reference to his lack of objectivity in any actions regarding Harris, rather than a reference to a lack of knowledge that he may have been violating an ethical rule.

We also agree that respondent's action resulted in injury to others during the nine years of multiple litigations involved in this matter. As the committee pointed out:

> The violations resulted in hundreds of thousands of dollars of legal fees being expended in the defense of frivolous lawsuits, the waste of the untold hours of judicial time, placed burdens upon the various defendants (both financial and otherwise) and caused other serious problems.

Besides the money spent to defend against various suits, the committee found that the defendants in these suits were also injured by their inability to obtain malpractice insurance for a period of years, and then faced increased costs of insurance afterwards, because of respondent's groundless lawsuits. Additionally, two of the victims of frivolous claims experienced difficulties with personal financing due to the contingent liability cast on their credit records by respondent's unfounded suits.

### B. *Aggravating and Mitigating Factors*

Having found misconduct and having reviewed the appropriate standards for discipline, we turn next to the factors in aggravation and mitigation to determine whether they support the recommended sanction. *See* Standard 9.1. The committee found five factors in aggravation:

> (1) dishonest or selfish motive, *see* Standard 9.22(b);
>
> (2) a pattern of misconduct, *see* Standard 9.22(c);
>
> (3) multiple offenses, *see* Standard 9.22(d);
>
> (4) refusal to acknowledge wrongful nature of conduct, *see* Standard 9.22(g); and
>
> (5) substantial experience in the practice of law, *see* Standard 9.22(i).

The commission did not refer to these factors in its report, but noted that it had "reviewed and considered the arguments concerning sanctions, as well as the Committee Findings in that regard."

We agree that all of these aggravating factors are supported by the record except for "pattern of misconduct." *See* Standard 9.22(c). Although respondent's conduct constituted "multiple offenses," in that he brought several frivolous claims against multiple defendants over a period of years, *see* Standard 9.22(d), we do not believe his misconduct constitutes a "pattern" as contemplated by the standard. Such a "pattern" has been found in the past under circumstances in which a respondent either faces us with a prior disciplinary record involving the same or similar wrongdoing, or when a respondent's misconduct in-

volves multiple clients. *See, e.g., In re Lincoln,* 165 Ariz. 233, 236, 798 P.2d 371, 374 (1990) ("respondent's history of disciplinary offenses shows a pattern of similar misconduct"); *In re Galusha,* 164 Ariz. 503, 505, 794 P.2d 136, 138 (1990) ("respondent's previous bar record demonstrates a chronic pattern of misconduct"); *In re MacAskill,* 163 Ariz. 354, 361, 788 P.2d 87, 94 (1990) ("[r]espondent engaged in numerous acts of misconduct in handling several clients' matters to the injury of those clients"); *In re Tarletz,* 163 Ariz. 548, 789 P.2d 1049 (1990) (multiple clients). *See also State v. Dixon,* 233 Kan. 465, 664 P.2d 286 (1983) (respondent's pattern of neglecting clients' matters in fourteen separate probate proceedings; cases considered spanned more than twenty years). The more usual type of "pattern of misconduct" typically considered an aggravating factor is described in *Galusha:*

> We note that respondent was involved in another disciplinary matter, involving similar misconduct, at the time he agreed to perform services for the client in this matter. We also note that respondent was aware of the Commission's recommendation that he be suspended for six months and one day in that matter. Despite heightened awareness of his duties and responsibilities, respondent knowingly failed to fulfill his ethical obligations to his client.

164 Ariz. at 505, 794 P.2d at 138.

In contrast to these prior cases in which we have found a "pattern of misconduct," in this case respondent has no prior disciplinary record, nor do we find that the existence of multiple counts of misconduct in this case necessarily constitutes a "pattern." For example, bar counsel readily conceded during the proceedings that although the complaint alleged fourteen counts, many were duplicates of others, and the allegations were separated only for the administrative purpose of sorting out the exhibits and histories of the proceedings. The allegations generally involved the filing of two overlapping litigations, which were eventually consolidated—the P.C. suits and the *Abril v. Harris* matter— both naming the same core defendants.

Only one client, Abril, was involved in these litigations. We also believe that a finding of a "pattern" of misconduct is inconsistent with the committee's statement that "[t]he fourteen-count Complaint relates to one underlying fact situation and the Respondent's reaction to that situation." Under these circumstances, we do not find a "pattern of misconduct" sufficient to constitute an additional aggravating factor to the "multiple offenses" we have already found.

The committee found only two mitigating factors:

(1) absence of a prior disciplinary record, *see* Standard 9.32(a); and

(2) reputation, *see* Standard 9.32(g).

Additionally, the committee found the following factors neither aggravating nor mitigating:

(1) forced or compelled restitution, *see* Standard 9.4(a); and

(2) agreeing to the client's demand for certain improper behavior or result, *see* Standard 9.4(b).

We agree that the record supports the existence of these mitigating and neutral factors. We give great weight, in particular, to respondent's previous unblemished disciplinary record as well as his professional contributions and accomplishments during his 30 years of practice. *See In re Mulhall,* 159 Ariz. 528, 768 P.2d 1173 (1989) (unblemished record prior to misconduct is mitigating). The record before us indicates that respondent is heavily involved in continuing legal education programs, has become certified in his area of expertise, and has actively participated in several bar sections and committees, as well as other professional organizations. We give particular weight to respondent's avowal that he has never been sanctioned in any court for frivolous claims before or since these suits arose. We agree with respondent's counsel's characterization at oral argument: this was a "bizarre" set of circumstances, and "aberrational" behavior for a lawyer of respondent's stature in the legal community.

We believe, however, that additional mitigating factors are present on this record and are relevant:

(1) personal or emotional problems, Standard 9.32(c);

(2) full and free disclosure to disciplinary board or cooperative attitude toward proceedings, Standard 9.32(e);

(3) interim rehabilitation, Standard 9.32(j); and

(4) imposition of other penalties or sanctions, Standard 9.32(k).

First, the record consistently indicates that respondent's "blind spot" in these litigations was due, in part, to the personal and emotional turmoil that arose out of the breakup of the Levine & Harris law practice. Several witnesses likened the partnership dissolution to a bitter divorce, with all its attendant emotional pain. Additionally, respondent experienced personal financial hardships as a result of the dissolution of the firm, which contributed to his lack of objectivity in these matters. Respondent has acknowledged his emotional problems in this regard, and has sought evaluation and counseling to address the "blind spot" that he now admits.

Second, respondent's cooperation during the committee proceedings is very apparent on this record. He consistently stipulated to the admission of bar exhibits, allowed interruption of the flow of his own testimony so that witnesses could testify at their convenience and to allow volunteer committee members to meet their personal scheduling requirements, and declined to delay the proceedings, perhaps to his own disadvantage, when bar counsel raised new issues or allegations of which respondent was previously unaware.

Third, respondent has made significant efforts at voluntary interim rehabilitation. *See In re Murray*, 159 Ariz. 280, 283, 767 P.2d 1, 4 (1988) (portion of suspension reduced because of respondent's rehabilitative effort since the misconduct). In his statement on review, respondent noted that he was implementing a three-prong voluntary rehabilitative program to address the committee's concerns, involving the following efforts:

(1) the institution of a mentoring program with attorney George Sorenson to address the committee's hope that future disputes between respondent and Harris be avoided;

(2) a program of evaluation and counseling by Robert Shapiro, M.D., a psychiatrist, to eliminate the "blind spot" pointed out by the committee;

(3) participation in continuing legal education programs addressing the specific ethical rules involved in this case.

In a letter submitted to the commission on February 7, 1991, Mr. Sorenson agreed to participate in a mentoring program involving the following terms:

(1) Mr. Sorenson will be available to respondent for advice and recommendations on any pending or future disputes between respondent, as a party or lawyer, and John D. Harris and Anthony Palumbo;

(2) Respondent agrees to be bound by Sorenson's advice, including a conclusion that respondent's position in any dispute is without merit;

(3) Mr. Sorenson will meet periodically with respondent and assist him professionally as a mentor and advisor as circumstances arise.

At oral argument, counsel for respondent informed this court that respondent has participated in this voluntary program since that agreement, and has no objection to its incorporation into terms of disciplinary probation. We find this is a mitigating factor to be considered in imposing a sanction. *See Rivkind*, 164 Ariz. at 160, 791 P.2d at 1043.

Fourth, we find that the imposition of other sanctions and fees by the courts, to the extent that respondent has paid them or will pay them in the future, should be considered in mitigation. *See, e.g., In re Lamberis*, 93 Ill.2d 222, 66 Ill.Dec. 623, 443 N.E.2d 549 (1982) (disciplinary sanctions already imposed by university for attorney's plagiarism were considered in mitigation). In this case, the record indicates that respondent has previously paid many of the sanctions imposed by the courts against him personally, totalling thousands of dol-

lars. Thus, the injury incurred has in some measure been alleviated. Failure to consider this alleviation of injury in imposing a disciplinary sanction would result in punitive action, which is not the object of these proceedings. *See In re Arrick,* 161 Ariz. 16, 22, 775 P.2d 1080, 1086 (1989).

 Our final consideration prior to imposing sanctions is the purpose of the sanction. In this case, we do not believe that the lengthy suspension recommended by the committee and the commission is necessary to achieve the goals of discipline. Indeed, the committee pointed out that, if it "could severely restrict Respondent's practice and/or recommend other requirements consistent with the purposes of lawyer discipline[,] the period of suspension might be shorter with even greater protection of the public." [19] Additionally, two members of the commission did not support the recommended sanction of three years suspension because they thought it was too lengthy "in light of the likelihood that Respondent will not re-engage in similar conduct."

In considering the goals of discipline, the committee found no great likelihood that respondent's misconduct would be repeated or that suspending him from the practice of law would greatly protect the public. The commission specifically found that respondent "did not engage in activities in an effort to harm the general public." We agree with these observations. We further conclude that respondent has made sincere efforts at rehabilitation, and believe those efforts "demonstrate that the public and the legal system are unlikely to suffer a risk of future misconduct." *See Rivkind,* 164 Ariz. at 160, 791 P.2d at 1043. Because we have found four additional mitigating factors on this record that were not considered by the committee or the commission, and have found no support for one aggravating factor that those tribunals considered, we conclude that the recommended sanction is too harsh. Under these circumstances, a lengthy suspension

"would accomplish nothing more than the needless destruction of respondent's career." *Hoover,* 161 Ariz. at 535, 779 P.2d at 1274.

We believe that this case meets the criteria for the sanction of probation. *See* Rule 52(a)(6)(B) ("Probation may be imposed only in those cases in which there is little likelihood that the respondent will harm the public during the period of probation, and the conditions of probation can adequately be supervised"); *see also* Standard 2.7, Commentary ("Probation is a sanction that should be imposed when a lawyer's right to practice law needs to be monitored or limited rather than suspended or revoked"). The imposition of terms of probation that incorporate respondent's rehabilitative efforts, including the mentoring program and counseling, will sufficiently reduce the likelihood that respondent will engage in future misconduct and will provide a means to provide restitution to the victims of his previous misconduct.

## C. *Proportionality*

 In the past, we have considered the question of proportionality appropriate in imposing disciplinary sanctions; however, as always, our primary obligation is to tailor the discipline according to the facts in each case. *In re Murray,* 159 Ariz. at 283, 767 P.2d at 4; *see In re Wines,* 135 Ariz. 203, 207, 660 P.2d 454, 458 (1983). Due to the unique facts of this case, however, the committee had difficulty in finding other misconduct that could be used as a direct comparison, because "no dispositive series of cases exists with conduct such as in this case." The commission also acknowledged that "cases like this one do not fit within 'cubby holes.'" *See Rivkind,* 164 Ariz. at 160, 791 P.2d at 1043 (in case of first impression under amended Arizona rules, court may consider "somewhat analogous cases").

---

**19.** Only this court or the commission has the discretion to impose the lesser sanction of probation. Rule 52(a)(6), Rules of the Arizona Supreme Court. Only this court has the discretion to impose conditions of probation that would limit a lawyer's license to practice law. Rule 52(a)(6)(B); *see also* Standard 2.8(g) (the state's highest court or disciplinary board may impose other requirements deemed "consistent with the purposes of lawyer sanctions.")

We find a similar problem in conducting a proportionality review in this case. A review of Arizona disciplinary cases that have warranted similar sanctions—a combination of suspension and probation—is unavailing, as this case is truly *sui generis*. We have found no case with misconduct of the unusual nature of this case, so we must tailor the discipline to these unique facts, rather than base the sanction on any comparison of how we have disciplined similar misconduct. *See Murray*, 159 Ariz. at 283, 767 P.2d at 4; *Wines*, 135 Ariz. at 207, 660 P.2d at 458.

However, our conclusion that a three-year suspension is too harsh is supported by considering analogous cases from other jurisdictions. For example, in the Colorado case involving a three-year suspension for the filing of frivolous claims, the lawyer was also found in contempt of court, failed to surrender himself to the sheriff, and abused the judicial process in an effort to avoid child support payments. *People v. Kane*, 655 P.2d 390 (Colo.1982). The two-year suspension imposed in *In re Sarelas*, 360 F.Supp. 794 (N.D.Ill.1973), *aff'd*, 497 F.2d 926 (7th Cir.1974), was a result of an attorney's conduct in filing fifteen frivolous separate suits involving unrelated parties, including defamatory and vituperative claims. In the Montana case on which the committee relied, a lawyer was suspended for only three months for conduct which included not only the filing of frivolous claims, but also disobedience of a court order, a threat to a public official, and several violations of the conflict of interest rules. *In re Belue*, 232 Mont. 365, 766 P.2d 206 (1988).

As with the cases cited by bar counsel, we find respondent's cases likewise distinguishable. Respondent cites two Florida cases in which the courts imposed only a public reprimand for repeated filing of frivolous claims under one cause of action; however, we find that those cases do not involve the extent of harm to the victims of the unfounded claims as is evident in this case.[20] *See Florida Bar v. Clark*, 528 So.2d 369 (Fla.1988) *cert. denied*, 488 U.S. 999, 109 S.Ct. 774, 102 L.Ed.2d 767 (1989); *Florida Bar v. Rosenberg*, 387 So.2d 935 (Fla.1980); *see also Florida Bar v. Thomas*, 582 So.2d 1177 (Fla.1991) (respondent who filed frivolous suit to punish another attorney publicly reprimanded and placed on one-year probation).

Although these cases indicate that a three-year suspension may be too harsh a disciplinary sanction in this case, no comparable case indicates what a proportionate sanction would be. In tailoring the discipline to the unique facts before us, we conclude that a combination of short-term suspension followed by probation will allow us to structure respondent's sanction toward the goals of discipline without punishing the misconduct.

We therefore find it appropriate to impose a six-month period of suspension prior to a term of probation in this case. Such a suspension is warranted to serve the goals of deterrence of similar misconduct by others, and to maintain public confidence in the integrity of the bar. *See In re Castro*, 164 Ariz. 428, 433, 793 P.2d 1095, 1100 (1990); *Hoover*, 161 Ariz. at 534, 779 P.2d at 1273. However, respondent's suspension will not be effective until sixty days from the date of this opinion, to allow time for respondent to make arrangements for his pending client files to be handled during his suspension. *See Hoover*, 161 Ariz. at 535, 779 P.2d at 1274. Because the suspension is for six months, the reinstatement

---

20. The commission stated:

Throughout the Committee proceedings Respondent argued that his conduct did not harm the public. Respondent characterizes the disputes as "two party" fights which involve Respondent and John "Chip" Harris. Respondent apparently fails to appreciate the consequences of his actions. A wrongful taking of funds, or a failure to act diligently, does not limit the universe of lawyer misconduct which harms the public. Respondent's actions caused the expenditure of substantial sums, by lawyers, insurance companies and the court system. Lawyers, including but not limited to Mr. Harris, expended time and mental energy in defending the many lawsuits. In addition, the State Bar, which has limited resources, devoted substantial energy, time and money toward the handling of this matter, leaving less energy, time and money for other disciplinary matters.

provisions of Rule 71(c), rather than those of Rule 71(d), shall apply. At the end of his six-month suspension, respondent will begin an initial two-year period of probation as provided by Rule 52(a)(6)(A), under the terms and conditions provided herein.

### D. *Conclusion*

We agree with the commission that clear and convincing evidence supports the findings of ethical violations on all counts except for counts 2 and 14. We find no pattern of misconduct as an aggravating circumstance, and we find four additional mitigating circumstances not weighed by the commission or committee in imposing sanctions. Finally, we find a three-year suspension too harsh, and find that a six-month suspension followed by a two-year probationary term is appropriate under the unique facts of this case.

## V. DISPOSITION

■ Respondent is suspended for a period of six months, effective sixty days after the filing of this opinion. Respondent's reinstatement after suspension will be as provided for in Rule 71(c). Upon reinstatement, respondent shall be placed on probation for a period of two years, subject to extension as provided for by Rule 52(a)(6)(A). The state bar shall submit proposed probationary terms prior to the commencement of the probationary period, which shall include, at a minimum, the following terms:

1. Respondent shall continue regular consultation and treatment with Robert Shapiro, M.D., in an effort to recognize and resolve the emotional problems that led to his "blind spot" in these litigations;

2. Respondent shall cause Dr. Shapiro to file a report of respondent's progress with chief bar counsel or her designee every ninety days during the first year of probation and every six months thereafter;

3. Respondent shall continue the mentor program established with attorney George Sorenson, as outlined in the agreement dated February 7, 1991, which provides that Mr. Sorenson will monitor all pending and future disputes between respondent and the parties to these litigations, and shall make a decision binding on respondent as to the merit of any action respondent takes in regard to such disputes. If Mr. Sorenson is unwilling or unable to continue as mentor for the length of respondent's probation, respondent shall obtain approval to substitute another appropriate mentor in his place.

4. Mr. Sorenson will report to the state bar any conduct respondent engages in that is contrary to Mr. Sorenson's decisions, as well as any conduct that appears to fall below the minimum standards of the profession as set forth in Rule 42, Rules of the Arizona Supreme Court.

5. Respondent will attend a minimum of twelve hours a year of continuing legal education programs on the subject of ethics, including those that address the particular rules violated in this case.

6. Respondent will provide to the state bar an itemization, with documentation, of which sanctions and awards of attorney's fees imposed against him personally in the prior judicial proceedings referenced in this case have been paid and which are still due and owing.

7. Respondent shall pay the unpaid fees and sanctions as restitution to the persons financially injured, pursuant to Rule 52(a)(7), regardless of the inclusion of the underlying judgments in his bankruptcy.[21] The state bar shall prepare a re-

---

**21.** We do not believe that respondent's potential discharge in bankruptcy from the underlying civil judgments precludes us from imposing a post-discharge disciplinary sanction of restitution as a term of probation. In this context, restitution is part of the rehabilitative process of our disciplinary proceeding rather than a reinstatement of any of the discharged civil judgments against respondent. *See, e.g., Brookman*

*v. State Bar of California,* 46 Cal.3d 1004, 251 Cal.Rptr. 495, 760 P.2d 1023 (1988) (imposition of restitution on attorney did not have effect of suspending his license for not paying a discharged debt, but purpose was to protect public and rehabilitate attorney). *Cf. Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (Chapter 7 discharge did not preclude a prior criminal restitution order as a "debt");

payment plan to provide for respondent's payment of any fees and sanctions still owing.

8. Respondent shall pay all costs that are or will be due and owing to the state bar as a result of respondent's probation prior to the termination of probation.

9. In the event that respondent fails to comply with any condition of probation, bar counsel shall file with the hearing committee a Notice of Non–Compliance. The hearing committee shall conduct a hearing at the earliest possible date, not to exceed thirty days after receipt of the notice, to determine whether a violation of probation has occurred, and, if so, to recommend an appropriate sanction. The state bar shall have the burden to prove noncompliance by a preponderance of the evidence.

Respondent shall also pay $15,941.95 to the state bar for the costs and expenses of these proceedings.

Because of due process concerns, we decline to follow the recommendation of the committee that respondent be ordered to immediately dismiss any remaining actions or pending appeals in these litigations or be prohibited from filing any future suits under any set of facts against any of these defendants.[22] We feel that compliance with probationary terms 3 and 4 have provided adequate protection in this regard.

Respondent is suspended, with probation imposed.

MOELLER, V.C.J., CORCORAN, J., and BROOKS and SHELLEY, JJ. (Retired), concur.

NOTE: Chief Justice STANLEY G. FELDMAN and Justice THOMAS A. ZLAKET recused themselves and did not participate in the determination of this matter; Judges EINO M. JACOBSON and J. THOMAS BROOKS of the Arizona Court of Appeals, Division One, were authorized to participate in this case by the Chief Justice of the Arizona Supreme Court, pursuant to Arizona Constitution, article VI, § 3. Judge MELVYN T. SHELLEY, now retired, was also designated to participate in this matter, but was unable to sign this opinion due to his extended absence from the country.

---

*State v. West,* 173 Ariz. 602, 845 P.2d 1097, (App.1992) (post-discharge order of restitution is valid in criminal proceeding, based on *Robinson* ). We reach this conclusion regardless of language that may have implied a contrary result in *In re Nefstead,* 163 Ariz. 518, 521, 789 P.2d 385, 388 (1990). Because the effect of a prior bankruptcy discharge on a subsequent disciplinary restitution order as a term of probation was neither argued nor analyzed in *Nefstead,* this implied contrary statement is disapproved.

**22.** The committee included the following parties in its recommendation of a total ban on future litigation: John D. Harris, Anthony J. Palumbo, John R. Cunningham, M. Byron Lewis, Daniel Cracchiolo, Edwin D. Fleming, Kenneth J. Sherk, Nicholas Udall, John G. Sestak, William Piatt, any complainant in this matter, bar counsel Peter M. Jarosz, and the law firms of any of these lawyers.