No. 90,703

In the Matter of ROBERT H. ROYER, JR., *Respondent*.

(78 P.3d 449)

Opinion filed October 31, 2003.

*Stanton A. Hazlett*, disciplinary administrator, argued the cause and was on the formal complaint for the petitioner.

*Ann L. Hoover*, of Topeka, argued the cause for the respondent, and *Robert H. Royer, Jr.,* respondent, argued the cause pro se.

*Per Curiam*: This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against Robert H. Royer, Jr., of Abilene, an attorney admitted to the practice of law in Kansas.

Complaints filed against the respondent alleged that the respondent violated KRPC 4.3 (2002 Kan. Ct. R. Annot. 429) (dealing with unrepresented person); KRPC 4.4 (2002 Kan. Ct. R. Annot. 430) (respect for rights of third persons); KRPC 8.1 (2002 Kan. Ct. R. Annot. 445) (bar admission and disciplinary matters); and KRPC 8.4 (2002 Kan. Ct. R. Annot. 449) (misconduct).

A disciplinary panel of the Kansas Board for the Discipline of Attorneys conducted a formal hearing, as required by Kansas Supreme Court Rule 211 (2002 Kan. Ct. R. Annot. 260). The office of the Disciplinary Administrator appeared by and through Stanton A. Hazlett, Disciplinary Administrator. The respondent, Robert H. Royer, Jr., appeared in person and by and through his attorney, Ann L. Hoover.

Based upon clear and convincing evidence, the panel made the following findings of fact and conclusions of law.

### "Findings of Fact

"1. Robert H. Royer . . . is an attorney at law. . . The Respondent was admitted to the practice of law in the state of Kansas on April 13, 1976. The Respondent is the municipal judge for the city of Abilene. Additionally, the Respondent is engaged in the private practice of law.

"2. On May 29, 1999, a severe storm passed through Abilene, Kansas, causing damage to two adjoining buildings—the Plaza Theater building and the JC Penney building.

"3. At the time of the storm, the Penney building was owned by Raymond D. Shanahan, subject to a mortgage held by Wayne R. and Karin K. Ward. The Respondent represented Mr. and Mrs. Ward.

"4. On June 23, 1999, the Respondent wrote to counsel for Mr. Shanahan regarding the damage sustained to the building. Neither Mr. Shanahan nor his counsel took any action in response to the Respondent's letter.

"5. During mid-July, 1999, the owners of the Theater building hired a company to demolish it. During the demolition, the Penney building was damaged further.

"6. On July 16, 1999, the Respondent wrote to counsel for the owners of the Theater building and the attorney for the city of Abilene. In the letter, the Respondent stated:

'I shared with him that there may be questions concerning the structural integrity of the building . . . .

'If in fact there is major structural damage to the wall that adjoins the Penney's building, it would be in everybody's best interest to know what insurance companies may be involved in resolving the situation.'

"7. On July 29, 1999, the Respondent wrote to the State Farm Insurance Company. In the letter, the Respondent stated:

'Significant structural damage did occur to the west wall of the building on the evening of Monday, July 26, 1999. As a result of demolition activities that evening and on through the next forty-eight hours, substantially the entire west wall of the insured structured [sic] has been opened, exposing all three floors. This has created a cavernous opening approximately 40 feet by 65 feet, which does need to be rebuilt and closed in. There also was structural damage to the north and south wall, and some internal damage caused from water leaks in connection with this demolition activity.'

"8. On behalf of Mr. and Mrs. Ward, the Respondent instituted mortgage foreclosure proceedings against Mr. Shanahan . . .

"9. On October 21, 1999, Monty Prescott of BG Consultants, Inc., examined the Penney building. Thereafter, Mr. Prescott prepared a letter regarding his preliminary findings. Mr. Prescott estimated the probable cost to repair the building to be between $143,500 and $173,500. Mr. Prescott strongly questioned whether the building should be repaired rather than demolished.

"10. On December 6, 1999, the Respondent wrote to counsel for Mr. Shanahan. The concluding paragraph provided as follows:

'Please keep in mind the City of Abilene is also becoming concerned about the building as the street is still partially blocked, and they have questions about the structural stability of the building if we get a heavy snow load on the roof. I am in a bit of an awkward position here as I serve as judge for

the city and if a violation of building code arises, it will be in my court that it will be filed.'

"11. On December 10, 1999, the attorney for the city of Abilene wrote to counsel for Mr. Shanahan. The letter provided:

'In speaking with local attorney Mr. Hank Royer, he has advised that there are discussions underway to determine what should be done with the building. It is my understanding that the options being considered are constructing a permanent west wall or demolishing the building. . . .

'The City is requesting that action be taken by the owner to resolve this matter as soon as possible.'

According to the letter, a copy was sent to the Respondent.

"12. On January 6, 2000, a claims specialist from the State Farm Insurance Company forwarded a payment to Mr. Shanahan. Based upon an appraisal and an estimate for repairs, State Farm agreed to pay $141,260, less the $2,000 deductible. State Farm forwarded a check in the amount of $99,260 to Mr. Shanahan. State Farm retained $40,000 for the engineering and construction management fees. State Farm agreed to pay the $40,000 when the restoration began.

"13. On February 17, 2000, Mr. Shanahan transferred the ownership of the property back to the Respondent's clients, Mr. and Mrs. Ward. Mr. Shanahan paid Mr. and Mrs. Ward the settlement monies received from State Farm, less $5,000.00.

"14. On February 22, 2000, the Respondent and counsel for Mr. Shanahan filed a joint motion to dismiss the foreclosure proceeding. Thereafter, the Court dismissed the action.

"15. On March 15, 2000, the Respondent wrote to Mr. Ward regarding the Penney building. Specifically, the letter provided:

'I again got a call from the City Manager concerning the Penney's Building on Tuesday. Neighbors, particularly Tim Geske to the south, are complaining about its condition and the appearance of the neighborhood.

'After our brief meeting at the bank last week, I did call Tim Elliott to see if he would look at the property and give you a bid to put the wall back in. He said it was a bigger project than he wanted to handle. I mentioned that Jerry Hawks did not give an optimistic indication when last I saw him and briefly mentioned the property.

'It is my impression that the city would like to see some movement on the property. . . . In reality, I expect the city is going to want to see some movement on the property or they may have to review it from their perspective.

'When we arranged this procedure, we did understand you would find someone to either buy and/or take the building and restore it, and that we wouldn't see it becoming a burden on the city. . . . Perhaps contacts with one of these groups offering the building at a nominal price or even offering

to give it away as a prize to those with the most creative use plan for the building, might be an expeditious way of getting it into someone's hands who might be interested in restoring it.'

"16. On March 29, 2000, the attorney for the city of Abilene wrote to Mr. Ward requesting that he update the city regarding his plans for the Penney building. Specifically, the attorney requested that Mr. Ward advise the city of his 'construction plans, sale plans, demolition plans, etc.' Additionally, the attorney asked Mr. Ward to forward any information in Mr. Ward's possession that the building had 'not lost its structural integrity.' The attorney asked Mr. Ward to respond within fifteen days. Mr. Ward did not respond to the attorney's letter.

*Id.* Prior to writing to Mr. Ward, the attorney for the city of Abilene contacted the Respondent. The Respondent informed the attorney for the city of Abilene that he no longer represented Mr. Ward regarding the Penney building and that the attorney for the city of Abilene should contact Mr. Ward directly. However, in June, 2000, the Respondent resumed advising and assisting Mr. Ward regarding the Penney building.

"17. On April 26, 2000, the inspector for the city of Abilene inspected the exterior of the Penney building. Based upon his inspection, the inspector concluded that the building was an unsafe and dangerous building.

"18. On May 2, 2000, the attorney for the city of Abilene wrote to Mr. Ward, enclosed a pending city resolution, and informed Mr. Ward that a hearing would be held on June 26, 2000. The attorney for the city of Abilene informed Mr. Ward that he should appear at the meeting as owner of the building and 'show cause why the building should not be condemned, ordered repaired, or demolished.'

"19. On May 15, 2000, the governing body of the city of Abilene passed the show cause resolution and scheduled a hearing for June 26, 2000.

"20. On June 7, 2000, Mr. Ward contacted the Respondent and discussed the Penney building. Mr. Ward informed the Respondent that he wanted to be rid of the property. The Respondent told Mr. Ward that he would approach a man, named Everett P. Mongerson, Jr., to see if he would be interested in purchasing the building.

"21. Mr. Mongerson was well known in Abilene, Kansas. The Respondent first met Mr. Mongerson in school as a child. The Respondent and his wife, Jo Ann Royer, were familiar with Mr. Mongerson and his personal situation.

"22. Mr. Mongerson was an alcoholic, frequently intoxicated, frequently homeless, did not have a bank account, and, during the majority of his adult life, unemployed. Mr. Mongerson had never owned any real property. The only job that Mr. Mongerson retained for a substantial period of time had been years before, as an orderly at Topeka State Hospital.

"23. The Respondent drove to Mr. Mongerson's temporary residence at 701 NE 3rd, Abilene, Kansas. The Respondent contacted Mr. Mongerson and told him that he had a deal for him. The Respondent told Mr. Mongerson that he wanted to give him the Penney building.

*Id.* Later, Mr. Mongerson's temporary residence was declared to be an unsafe and dangerous structure by the city of Abilene.

"24. Mr. Mongerson told the Respondent that he did not want to take charity. The Respondent agreed to sell the property to Mr. Mongerson for one dollar. Mr. Mongerson told the Respondent that he did not have one dollar. The Respondent told Mr. Mongerson that he would give him the dollar. Mr. Mongerson agreed to purchase the building. The Respondent gave Mr. Mongerson a dollar and Mr. Mongerson gave the dollar back to the Respondent.

"25. The Respondent drove Mr. Mongerson to the Penney building. The Respondent told Mr. Mongerson that he could salvage whatever he wanted from the building.

"26. Earlier in the day the Respondent had prepared a 'Contract for Sale of Real Estate' and a quit claim deed. The Respondent presented Mr. Mongerson with the contract. The contract included the following provisions:

'All tax liability shall be assumed by the Purchaser. The Purchaser agrees as further consideration to pay to the Seller 25% of the net sales price of the building after it is restored and later sold by the Purchaser or one-half of the salvage value if the Purchaser decides to salvage the materials and demolish the building. All expenses for remodeling or demolishing shall be the sole expense of the Purchaser.'

Mr. Mongerson signed the contract.

"27. The Respondent hand-delivered the contract and the deed to Mr. Ward. After Mr. Ward signed the contract and the deed, at 3:35 p.m., on June 7, 2000, the Respondent filed the deed with the Dickinson County, Kansas, Register of Deeds.

"28. After learning that Mr. Ward had transferred the ownership interest in the Penney building to Mr. Mongerson, on June 13, 2000, the city of Abilene notified Mr. Mongerson of the condemnation proceedings.

"29. On June 14, 2000, the attorney for the city of Abilene wrote to the Respondent and Mr. Ward. The letter provided, in pertinent part, as follows:

'It would appear on or about June 7, 2000, a real estate deal was brokered between Mr. Ward and an Everett Mongerson. I have been informed that Mr. Royer helped facilitate the agreement. The City is concerned that this real estate deal took place to avoid the possibility of the property being determined to be a dangerous structure, and the responsibility of the owner to either repair or raze the structure.'

'In that vein, the City Commission has requested to review several issues with you in regard to the J.C. Penney building. The first issue is that we would like to see the contract between Mr. Ward and Mr. Mongerson. We, at this point in time, have a copy of the deed that has been filed with the Register of Deeds of Dickinson County, but would like to see the contract and would like to be informed as to the amount of the purchase price.'

'Secondly, at the time that the building that housed the Plaza Theater collapsed, it is our understanding that Mr. Ward had insurance on the J.C. Penney Building, and received some insurance proceeds. We would like to know the name of the insurance company and the policy number. Further, we would like to know the amount of insurance proceeds received, and what the insurance proceeds were to be used for. The City is interested as to whether or not any of the proceeds received from the insurance company were to be used [for] demolition of the building.'

'Obviously this situation has placed the City of Abilene in a very difficult situation. If the City were to be responsible for demolishing this building, we have estimated costs between $40,000.00 and $50,000.00. Obviously that is going to be passed on to the citizens of Abilene, Kansas. The Governing Body, as a representative for the City of Abilene, Kansas, would like to know what events led up to the transpiring of the contract between Mr. Ward and Mr. Mongerson, and further, what monies Mr. Ward received from the insurance company, if any. I would expect these documents to be delivered to my office within seven (7) days from today's date.'

The record does not reflect any response by the Respondent to this request.

"30. After purchasing the Penney building, Mr. Mongerson told Jim Stout about his acquisition. Mr. Stout told Mr. Mongerson that because Mr. Mongerson was unable to pay the costs of repair or demolition, that the city of Abilene, thus the taxpayers of the city of Abilene, would bear the cost of the demolition.

"31. On June 19, 2000, the attorney for the city of Abilene met with and interviewed Mr. Mongerson. During the interview, Mr. Mongerson said that he did not read the contract for the sale of the house and that he was intoxicated at the time he signed the contract. Mr. Mongerson said that the Respondent told him that eventually the city would tear down the building, but in the meantime, he could salvage what he could find in the building. Mr. Mongerson said that the Respondent told him that the city could not come 'back on' him because Mr. Mongerson did not have any money. Mr. Mongerson described himself as the 'fall guy.'

*Id.* At the hearing on this matter, the Respondent testified that Mr. Mongerson was not intoxicated at the time he signed the contract. Additionally, the Respondent testified that after the transaction was featured in the local newspaper, Mr. Mongerson told the Respondent that he was going to tell everyone he was intoxicated at the time he signed the contract. The Hearing Panel believes that whether Mr. Mongerson was intoxicated at the time the contract was signed is not determinative of the issues in this matter.

"32. The city of Abilene retained an attorney, Michael A. Montoya, to represent Mr. Mongerson in an attempt to have the deed set aside. Through Mr. Montoya, Mr. Mongerson filed suit against Mr. and Mrs. Ward to have the conveyance set aside.

"33. Thereafter, the building was demolished by the city of Abilene. It cost $28,000 to demolish the building.

"34. Eventually, Mr. Mongerson and Mr. and Mrs. Ward reached a settlement of the case through their attorneys. Pursuant to the settlement agreement, Mr. Mongerson transferred the ownership of the property to Mr. and Mrs. Ward. Mr. and Mrs. Ward paid $25,000.00 toward the demolition costs. Mr. Ward continues to own the building.

"35. On December 1, 2001, Mr. Mongerson passed away.

## "CONCLUSIONS OF LAW

"1. Based upon the findings of fact, a majority of the Hearing Panel concludes as a matter of law that the Respondent violated KRPC 4.4 and the Hearing Panel unanimously concludes that the Respondent violated KRPC 8.4, as detailed below.

"2. KRPC 4.4 provides:

'In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.'

*Id.* 'Substantial' is defined in the Kansas Rules of Professional Conduct as that which 'denotes a material matter of clear and weighty importance.' KRPC Terminology. The comment to the rule provides:

'Responsibility to a client requires a lawyer to subordinate the interests of others to those of the client, but that responsibility does not imply that a lawyer may disregard the rights of third persons. It is impractical to catalogue all such rights, but they include legal restrictions on methods of obtaining evidence from third persons.'

"3. In order to determine whether a Respondent's action had a substantial purpose 'other than to embarrass, delay, or burden a third person,' it is appropriate to analyze the Respondent's motive for engaging in the act. See *In re Levine*, 174 Ariz. 146, 847 P.2d 1093 (1993) (When a Respondent claims that an objectively arguable ground for a legal claim exists, the Respondent's subjective purpose in bringing the action is relevant to determine whether the Respondent violated rule 4.4.); *In re Wagner*, 744 N.E.2d 418 (Ind. 2001) (The Respondent asserted that he engaged in the conduct at request of his client. The Court found that the Respondent violated rule 4.4. The Court found that 'purely opportunistic acts such as those taken by the [R]espondent will not be tolerated.')

"4. In this case, the Respondent's actions served two purposes. First, the Respondent's actions served to burden Mr. Mongerson and the city of Abilene. Additionally, the Respondent's actions served to benefit his client by transferring the ownership of the property prior to the demolition of the building.

"5. In *Kentucky Bar Association v. Reeves*, 62 S.W.3d 360 (Ky. 2002), the Respondent's actions likewise served two purposes. There, the Court found that the Respondent violated rule 4.4 even though his actions served a legitimate purpose and an illegitimate purpose. The Court stated that the means that the Respondent chose exceeded the bounds of legitimate representation. 'Only with tunnel vision can the [Respondent's actions] be deemed, when viewed in its entirety, to have had a solely legitimate "substantial purpose." The application of common sense to the making of a finding of the "purpose" or motive of [the Respondent in engaging in the conduct] strongly suggests that [the Respondent's] purpose and motive was to "embarrass, delay or burden a third person.' "

"6. A case with facts analogous to those in the instant case is *Florida Bar v. Charnock*, 661 So. 2d 1207 (Fla. 1995). In that case, Mr. Charnock represented a Dutch consortium that owned vacation rental properties. Additionally, Mr. Charnock maintained a power of attorney with the right to negotiate and enter into lease agreements in behalf of the consortium. Shortly after the consortium purchased the properties, Castle Pools filed a mechanic's lien against one of the properties. Mr. Charnock wrote to Castle Pools and informed it that the lien was invalid. Later, Castle Pools commenced a foreclosure action on the lien. Neither Mr. Charnock nor the consortium was aware of the action. After the action was completed, Mr. Charnock learned of the proceedings. Mr. Charnock acted to set aside the judgment. Initially, Mr. Charnock's attempts were unsuccessful. Mr. Charnock became aware of a rule that if the property was possessed by someone else, then that person would be allowed to retain possession of the property and obtain a stay of the writ of possession. Mr. Charnock entered into an oral contract with someone to possess the property. However, that person never actually took physical possession of the property. The Florida referee found that the 'Respondent's creation of the tenant relationship had no substantial purpose other than to embarrass, delay, or burden a third person.' The referee found Mr. Charnock's conduct to be deceitful and prejudicial to the administration of justice. The Florida Court affirmed the referee and found that Mr. Charnock's actions were a 'fraud on the court in an effort to frustrate the transfer of possession of the property.' The Court found that Mr. Charnock's actions went beyond the boundaries of zealous advocacy . . . and inhibited the proper administration of justice.'

"7. In this case, in his capacity as an attorney for Mr. and Mrs. Ward, the Respondent facilitated the transfer of the ownership of the property from Mr. and Mrs. Ward to Mr. Mongerson. 'Negotiating' the contract between Mr. and Mrs. Ward and Mr. Mongerson had no substantial purpose other than to burden Mr. Mongerson and the city of Abilene. Mr. Mongerson was burdened by owning property that had . . . back taxes and a negative value. The city of Abilene was burdened by retaining an attorney to assist Mr. Mongerson in transferring the ownership of the prop-

erty back to Mr. and Mrs. Ward. The city of Abilene was also burdened by incurring the costs for demolishing the building. Guided by the persuasive authority included above and despite the fact that the Respondent's actions served a purpose beneficial to Mr. and Mrs. Ward, a majority of the Hearing Panel concludes that the Respondent violated KRPC 4.4.

"8. Engaging in conduct 'involving dishonesty, fraud, deceit or misrepresentation' amounts to professional misconduct. KRPC 8.4(c). The Respondent facilitated the fraudulent transfer of the ownership of the property from Mr. Ward to Mr. Mongerson. At the time the Respondent offered to sell the building, in behalf of Mr. Ward, to Mr. Mongerson, the Respondent should have known that Mr. Mongerson had neither the means nor the ability to rehabilitate or demolish the subject property. The Respondent knew or should have known that the subject property had a negative value and the transfer of the ownership of the property to Mr. Mongerson would result in the city of Abilene paying for the costs of demolition. The Respondent effected the transfer of the property from Mr. and Mrs. Ward to Mr. Mongerson so that Mr. and Mrs. Ward could avoid incurring the costs of demolition. Accordingly, the Hearing Panel unanimously concludes that by facilitating the fraudulent transfer, the Respondent 'engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation,' in violation of KRPC 8.4(c).

## "RECOMMENDATION

"In making this recommendation for discipline, the Hearing Panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"*Duty Violated.* The Respondent violated his duty to the public to maintain personal integrity.

"*Mental State.* The Respondent knowingly violated his duty.

"*Injury.* As a result of the Respondent's misconduct, the Respondent caused actual injury to Mr. Mongerson and the city of Abilene.

"*Aggravating or Mitigating Factors.* Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following aggravating factors present:

"Refusal to Acknowledge Wrongful Nature of Conduct. In his initial responses and continuing throughout his testimony at the hearing, the Respondent refused to acknowledge the wrongful nature of his conduct.

"Vulnerability of Victim. Mr. Mongerson was vulnerable to the Respondent's misconduct.

"Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the Respondent to the practice of law in the state of Kansas in 1976. At the time he engaged in the misconduct, the Respondent had been practicing law for twenty-four years. Accordingly, the Hearing Panel concludes that the Respondent had substantial experience in the practice of law.

"Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the Hearing Panel, in this case, found the following mitigating circumstances present:

"Absence of a Prior Disciplinary Record. The Respondent has not previously been disciplined.

"Previous Good Character and Reputation in the Community Including any Letters from Clients, Friends, and Lawyers in Support of the Character and General Reputation of the Attorney. The Respondent is an active and productive member of the bar in Abilene, Kansas. He enjoys the respect of his peers and clients and generally possesses a good character and reputation as evidenced by several letters received by the Hearing Panel.

"In addition to the above-cited factors, the Hearing Panel has thoroughly examined and considered the following Standards:

'Reprimand is generally appropriate when a lawyer knowingly engages in any other conduct that involves dishonesty, fraud deceit, or misrepresentation and that adversely reflects on the lawyer's fitness to practice law. Standard 5.13.'

'Reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system. Standard 7.3.'

"Based upon the findings of fact, conclusions of law, and the Standards listed above, the Hearing Panel unanimously recommends that the Respondent be censured by the Kansas Supreme Court. The Hearing Panel further recommends that the censure be published in the Kansas Reports."

## One member of the hearing panel opined that Respondent

"did not violate KRPC 4.4. KRPC 4.4 provides that an attorney 'shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . .' See State ex rel. Scales v. Committee on Legal Ethics of West Virginia, 446 S.E. 2d 729 (W. Va. 1994). It is apparent that while Respondent embarrassed, delayed and unreasonably burdened both the City and Mr. Mongerson, Respondent's purpose in doing so was to prevent his client from having to pay demolition costs. While his actions were inappropriate and in contravention of KRPC 8.4(c), his substantial purpose of advancing his clients' financial interests precludes a finding of violation of KRPC 4.4."

but in "all other respects," concurred with and joined in the final hearing report.

The respondent files no exception to the final hearing report of the panel. As such, the hearing panel's report is deemed admitted under Supreme Court Rule 212(c) (2002 Kan. Ct. R. Annot. 266). To warrant a finding of misconduct, the charges must be established by clear and convincing evidence. Supreme Court Rule 211(f) (2002 Kan. Ct. R. Annot. 260); *In re Harris*, 261 Kan. 1063, 1066, 934 P.2d 965 (1997). We conclude that the findings of fact and the conclusions of law in the final hearing report are supported by clear and convincing evidence, and we adopt the findings and conclusions of the hearing panel. We further conclude that clear and convincing evidence establishes that the respondent violated KRPC 4.4 (2002 Kan. Ct. R. Annot. 430) (respect for rights of third persons) and KRPC 8.4(c) and (g) (2002 Kan. Ct. R. Annot. 449) (misconduct).

Initially, the Disciplinary Administrator recommended that the respondent be suspended for a period of 6 months; however, the panel concluded that the respondent should receive public censure by this court. In adopting this recommendation, the panel referred to the ABA Standards for Imposing Lawyer Sanctions (1991). The panel referred to Standard 5.13, calling for reprimand when a lawyer knowingly engages in *other* conduct that involves dishonesty, fraud, deceit, or misrepresentation and that adversely reflects on a lawyer's fitness to practice law. The panel also referred to Standard 7.3, stating that reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system. Ultimately, the Disciplinary Administrator changed his recommendation from suspension to a published censure based upon his conclusion that the respondent would be sufficiently punished with a published censure in light of the length of time this case has been pending and the adverse publicity generated by this case in the respondent's local community.

We have considered the findings of fact, the conclusions of law, and the recommendations of the hearing panel while recognizing

that no exceptions were filed by the respondent. We do not believe that the recommended discipline by the panel is appropriate because it fails to reflect the serious nature of the violations involved in this case. Instead, we believe that a 3-month suspension from the practice of law more appropriately reflects the nature of the violations in this case.

The Standards relied upon by the panel in recommending discipline more or less involve negligent conduct by a lawyer. While Standard 5.13 does suggest intentional conduct adversely reflecting on a lawyer's fitness to practice, the comments of this section generally include conduct related to, but not directly involved in, the practice of law. See *In re Gershater*, 256 Kan. 512, 515-16, 886 P.2d 343 (1994). In this case, the respondent's actions directly relate to the practice of law. Prior to the transfer of the property, the evidence establishes that the respondent knew the subject property had a negative value and the transfer of ownership of the property to Everett P. Mongerson, Jr., would result in the city of Abilene paying for the cost of demolition. The hearing panel unanimously concluded that by facilitating the fraudulent transfer, the respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of KRPC 8.4(c). Moreover, the panel concluded that the respondent, in his initial responses and continuing throughout his testimony at the hearing, refused to acknowledge the wrongful nature of his conduct. The respondent took no exceptions to the conclusion that while his actions served to benefit his client, the transfer of the property predominantly served to burden Mongerson and the city of Abilene, thereby causing injury or potential injury to the city and Mongerson, as well as the public and the legal system.

In our opinion, the respondent's actions may not be characterized as negligent; thus, the hearing panel's citation to Standard 7.3 involving negligent conduct is not appropriate. However, Standard 7.2 involving violations of duties owed to the profession provides that suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system. In this case, the respondent's actions were

intentional, involving not only a violation of duties owed to the profession, but also involving dishonesty, fraud, deceit, or misrepresentation amounting to professional misconduct in violation of KRPC 8.4(c). The respondent's actions are directly involved in his professional responsibility to his client, to the public, and to the profession as a lawyer. Under the circumstances, the court concludes that the appropriate sanction for the above violations is suspension from the practice of law in Kansas for a period of 3 months.

IT IS THEREFORE ORDERED that respondent, Robert H. Royer, Jr., be suspended from the practice of law in the State of Kansas for a period of 3 months, commencing October 31, 2003, in accordance with Supreme Court Rule 203(a)(2) (2002 Kan. Ct. R. Annot. 224).

IT IS FURTHER ORDERED that the respondent comply with the provisions of Supreme Court Rule 218 (2002 Kan. Ct. R. Annot. 279).

IT IS FURTHER ORDERED that this opinion be published in the official Kansas Reports and that the costs herein be assessed to the respondent.